## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
----------------------------------------------------------------------

FREDDY FERNANDEZ, LUIS VELASQUEZ,
and GIOVANNY GONZALEZ, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

         -against-

KINRAY, INC., CARDINAL HEALTH, INC.,

             Defendants.

---------------------------------------------------------------------- x

Case No.: CV 13-4938

Hall, J.
Gold, M.J.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Felice B. Ekelman, Esq.
Noel P. Tripp, Esq.
Lori A. Jablczynski, Esq.
Laura M. Bedson, Esq.
JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

*ATTORNEYS FOR DEFENDANTS*

## TABLE OF CONTENTS

PROCEDURAL HISTORY ............................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 2

    **A.**    Kinray's Business ...................................................................................................... 2

    **B.**    Routeholders Signed Independent Contractor Agreements Governing the the
Parties' Relationship ............................................................................................... 2

    **C.**    Routeholders Operated Independent Businesses. .................................................... 5

    **D.**    Routeholders Contracted with Helpers, Kinray Did Not. ....................................... 6

**II.**    LEGAL STANDARD ........................................................................................................ 7

**III.**    THERE ARE NO DISPUTED FACTS AS TO THE CONTRACTOR STATUS ............ 8

    **A.**    Plaintiffs were Independent Contractors under the FLSA. ...................................... 9

        1.    Kinray Did Not Exercise Control Over Routeholders or Deliveries. ............. 13

            a.    Bellwether Routeholders independently determined the extent to which
they would rely on Helpers to service routes. ........................................... 13

            b.    Bellwether Routeholders controlled the manner in which they fulfilled
their contractual obligations. ..................................................................... 16

            c.    Bellwether Routeholders were free to determine the extent of their
relationship with Kinray. .......................................................................... 19

        2.    Bellwether Routeholders Made Substantial Investment and Had Substantial
Opportunity for Profit or Loss. ..................................................................... 20

        3.    Fulfilling the Delivery Contracts Required Skill and Substantial Initiative... 21

        4.    The Duration of the Relationship Does Not Militate Against Contractor
Status. ........................................................................................................... 23

        5.    The Routeholders Services were not Integral to Kinray's Business. .............. 23

    **B.**    Helpers were Engaged by Routeholders, Not Defendants. .................................... 24

    **C.**    Plaintiffs were Independent Contractors Under the NYLL .................................. 25

**IV.**    EVEN IF ROUTEHOLDERS OR HELPERS WERE EMPLOYEES (WHICH THEY
WERE NOT), BELLWETHER PLAINTIFFS WERE EXEMPT FROM OVERTIME AS
"LOCAL DRIVERS" ...................................................................................................... 26

**V.**      KINRAY'S DECISION TO CLASSIFY PLAINTIFFS AS "NON-EMPLOYEES" WAS
           MADE IN GOOD FAITH AND THUS LIQUIDATED DAMAGES ARE NOT
           APPROPRIATE............................................................................................................. 27

**VI.**     THERE IS NO EVIDENCE OF WILLFULNESS AND THUS THE LIMITATIONS
           PERIOD UNDER THE FLSA IS TWO YEARS, AND NYLL LIQUIDATED
           DAMAGES ARE NOT APPROPRIATE PRIOR TO NOVEMBER 24, 2009 ............... 29

**VII.**    DEFENDANTS DID NOT RETALIATE AGAINST PLAINTIFF FERNANDEZ........ 30

CONCLUSION............................................................................................................ 30

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Affrunti v. Long Island Univ.*,

    2005 U.S. App. LEXIS 12372 (2d Cir. June 22, 2005) ..................................................... 8

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242, 248 (1986) ............................................................................................. 8

*Arena v. Delux Transp. Servs.*,

    3 F. Supp. 3d 1, 10–14 (E.D.N.Y. 2014) .......................................................... 9

*Arena v. Plandome Taxi Inc.*,

    2014 U.S. Dist. LEXIS 51967 ..................................................................................... 24

*Augustyniak v. Lowe's Home Ctr., LLC*,

    2016 U.S. Dist. LEXIS 15112 (W.D.N.Y. Feb. 8, 2016) ............................................... 18

*BellSouth Telecomms., Inc., v. W.R. Grace & Co.*,

    77 F. 3d 603 (2d Cir. 1996) ....................................................................................... 8

*Bharat v. Brookhaven Mem. Hosp. Aded Ctr. Inc.*,

    687 N.Y.S.2d 667 (N.Y, App. Div. 1999) ...................................................................... 26

*Browning v. CEVA Freight, LLC*,

    885 F. Supp. 2d 590 (E.D.N.Y. 2012) ................................................................. *passim*

*Bynog v. Cipriani Group, Inc.*,

    1 N.Y.3d 193 (2003) .................................................................................................. 26

*Canelas v. A'Mangiare Inc.*,

    2015 U.S. Dist. LEXIS 66316 (S.D.N.Y. May 14, 2015)................................................. 26

*Carrell v. Sunland Const., Inc.*,

    989 F.2d 330 (5th Cir. 1993) ..................................................................................... 17

*Celotex Corp. v. Catrett*,

    477 U.S. 317 (1986).................................................................................................. 7

*Clarke v. JPMorgan Chase Bank, N.A.*,

    2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. Mar. 26, 2010) ............................................... 29

*Dale v. Dretke*,

    2005 U.S. Dist. LEXIS 33926 (E.D. Tex. 2005) ............................................................ 18

*Deboissiere v. Am. Mod. Agency*,

2010 U.S. Dist. LEXIS 113776 (E.D.N.Y. Oct. 22, 2010) .......................................... 23, 25

*Dieterich v. Munoz, et al.*,

Index No. 7372/2011 (Dutchess Sup. Ct. June 26, 2014) ................................... 27

*Dister v. Cont'l Group, Inc.*,

859 F.2d 1108 (2d Cir. 1988) .......................................................................... 7

*El v. Potter*,

2004 U.S. Dist. LEXIS 24447 (S.D.N.Y. Dec. 6, 2004) ..................................... 28

*Forbes v. Lighthouse Int'l*,

U.S. Dist. LEXIS 62454 (S.D.N.Y. May 1, 2013) .......................................... 7, 8

*Gagen v. Kipany Prods., Ltd.*,

27 A.D.3d 1042 (N.Y. App. Div. 3d Dep't Mar. 30, 2006) ............................ 23

*Guifu Li v. A. Perfect Day Franchise, Inc.*,

270 F.R.D. 509 (N.D. Cal. 2010) ..................................................................... 18

*Howard* v. *Port Authority*,

684 F. Supp. 2d 409 (S.D.N.Y. 2010) ............................................................... 29

*Kadden v. Visualex, LLC*,

2012 U.S. Dist. LEXIS 151800 (S.D.N.Y. Oct. 22, 2012) ............................... 29

*Lin v. Benihana Nat'l Corp.*,

2010 U.S. Dist. LEXIS 132871 (S.D.N.Y. Nov. 9, 2010) ................................ 26

*Luxama v. Ironbound Express, Inc.*,

U.S. Dist. LEXIS 9929 (D. N.J. Jun. 28, 2012) ................................................ 15

*Mateo v. Universal Language Corp.*,

2015 U.S. Dist. LEXIS 128377 (E.D.N.Y. Sept. 23, 2015) .............................. 21

*Meyer v. United States Tennis Ass'n*,

2014 U.S. Dist. LEXIS 128209 (S.D.N.Y. Sept. 11, 2014) .............................. 20

*Moon* v. *Kwon.*,

248 F. Supp. 2d 201 (S.D.N.Y. Sept. 9, 2002) ................................................. 29

*Muhammed Chowdhury v. Hamza Express Food Corp.*,

2016 U.S. App. LEXIS 21870 (2d Cir. Dec. 7, 2016) ...................................... 28

*Pierre v. Air Serv Sec.*,

2016 U.S. Dist. LEXIS 128891 (E.D.N.Y. Sept. 21, 2016) .............................. 30

iv

*Preacely v. AAA Typing & Resume, Inc.*,
   U.S. Dist. LEXIS 33684 (S.D.N.Y. Mar. 18, 2015) ........................................................ 24

*Prue v. Hudson Falls Post No. 574*,
   2016 U.S. Dist. LEXIS 96985 (N.D.N.Y. July 26, 2016)................................................. 28

*Purdy v. Aero-Expeditors, Inc.*,
   1967 U.S. Dist. LEXIS 11479 (E.D.N.Y. Mar. 9, 1967)................................................. 28

*Salahuddin v. Goord*,
   467 F. 3d 263 (2d Cir. 2006)............................................................................................. 8

*Saleem v. Corporate Transportation Group, Ltd., et al.*,
   2017 U.S. App. LEXIS 6305 (2d Cir. 2017) ........................................................... *passim*

*Sellers v. Royal Bank of Can.*,
   2014 U.S. Dist. LEXIS 4563 (S.D.N.Y. Jan. 8, 2014)..................................................... 20

*Stull v. Noble Logistics Servs.*,
   No. C064308 (Cal. App. Jun. 8, 2011) ............................................................................ 15

*Sun v. China 1221, Inc.*,
   2016 U.S. Dist. LEXIS 52292 (S.D.N.Y. Apr. 19, 2016)................................................. 28

*Tarazona v. Rotana Cafe & Rest. Inc.*,
   2017 U.S. Dist. LEXIS 78274 (E.D.N.Y. May 23, 2017) ................................................ 28

*Taylor v. Waddell & Reed, Inc.*,
   2012 WL 3584942 (S.D. Cal, Aug. 20, 2012) ................................................................ 17

*Thomas v. TXX Servs.*,
   2016 U.S. App. LEXIS 19429 (2d Cir. Oct. 25, 2016)...................................................... 9

*United States v. Silk*,
   331 U. S. 704, 716 (1947).......................................................................................... *passim*

*Velu v. Velocity Express, Inc.*,
   666 F. Supp. 2d 300, 305–08 (E.D.N.Y. 2009) ................................................. 9, 16, 24, 26

*Wong v. Hunda Glass Corp.*,
   2010 U.S. Dist. LEXIS 62653 (S.D.N.Y. June 22, 2010)................................................. 29

*Yi v. Sterling Collision Ctrs., Inc.*,
   480 F.3d 505 (7th Cir. Ill. Mar. 13, 2007) ..................................................................... 27

*Young v. Cooper Cameron Corp.*,

586 F.3d 201 (2d Cir. 2009)...................................................................................... 29

**Statutes**

29 U.S.C. §§ 201 *et seq.* .......................................................................................... 1

29 U.S.C. § 213(b)(11) ............................................................................................. 26

29 U.S.C.S. § 260 ...................................................................................................... 28

New York Labor Law § 193 ...................................................................................... 26

New York Labor Law § 195 ...................................................................................... 26

New York Labor Law § 198(1-a) .............................................................................. 28

New York Labor Law §§ 650 *et seq* ........................................................................ 1

**Other Authorities**

12 NYCRR 142-2.2 .................................................................................................... 26

21 C.F.R. § 1301.71 ................................................................................................... 2

21 C.F.R. § 1301.77 ................................................................................................... 2

29 CFR § 516.15 ........................................................................................................ 27

29 C.F.R. § 578.3 ....................................................................................................... 29

Defendants Cardinal Health, Inc. and Kinray, Inc. ("Kinray," together the "Defendants"), by and through undersigned counsel, hereby move for summary judgment on the claims of the Bellwether Plaintiffs. There are no disputes as to the facts material to the determination of the legal issues raised in Defendants' Motion. As such, Defendants request the Court enter summary judgment in their favor.

## PROCEDURAL HISTORY

On September 4, 2013 Plaintiffs Giovany Gonzalez, Freddy Fernandez and Luis Velasquez filed their Complaint on behalf of themselves and all others similarly situated. (DKT 1). On August 7, 2014, Plaintiffs filed a motion to amend, correct and supplement the Complaint which was granted on December 30, 2014. (DKT 212). The Amended Complaint was filed on behalf of fifteen individuals, and asserts six causes of action. (DKT 191-3). The first claim is for overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"); the second is a claim for overtime violations under the New York Labor Law §§ 650 *et seq.* ("NYLL"); the third is a claim for notice violations under the NYLL; and the fourth is a claim for unlawful deductions under the NYLL. The fifth and sixth claims are for retaliation under the FLSA and NYLL as to Plaintiff Fernandez only.

The Parties stipulated to streamline discovery and dispositive motion practice by identifying nineteen Bellwether Plaintiffs. (DKT 285).[1] The Bellwether Plaintiffs include nine individuals who were either 1) parties to Independent Contractor Agreements ("IC Agreements") to provide delivery services to Kinray or 2) proprietors of corporations which were parties to IC Agreements to provide such services (such contract holders hereinafter referred to as "Routeholders"); and, ten helpers who were not parties to IC Agreements with Kinray, but were engaged by Routeholders to perform delivery services on the Routeholders' behalf (hereinafter referred to as "Helpers"). Plaintiffs' claims fail

---

[1] The Bellwether Plaintiffs are Routeholders Alexis Franco, David Coello, David Villarejo, Freddy Fernandez, Henry Narvaez, Jorge Gamarra, Julio Gomez, Luis Velasquez, and Miguel Bautista, and Helpers Adrianna Renteria, Arthur Fernandez, Frank Rodriguez, Freddy Vasquez, Maria Romero, Neil Guzman, Orlando Ocampo, Oscar Renteria, Paula Dorado, and Yolanda Aguirre. (Statement of Material Facts ("SOMF") at ¶ 9).

because they were properly designated as independent contractors.

## STATEMENT OF FACTS

Defendants hereby incorporate, by reference, the Statement of Material Facts ("SOMF") filed previously pursuant to Federal Rule of Civil Procedure 56(c)(1) (DKT 325), and highlight the undisputed material facts for the Court's convenience.

### A.   Kinray's Business

Kinray, based in Whitestone, New York, is a wholesale pharmaceutical distributor with retail customers principally located in New York, New Jersey, Pennsylvania, Connecticut, Rhode Island, and Massachusetts. (SOMF at ¶¶ 10, 11). Kinray secures the right to a franchise to purchase and distribute pharmaceuticals from manufacturers and resells such goods to independent pharmacy retailers pursuant to vendor agreements. (SOMF at ¶ 12).[2] In or around January 2011, Cardinal Health, Inc. acquired Kinray. (SOMF at ¶ 15). Kinray does not charge customers separately for the delivery of pharmaceutical products. (SOMF at ¶ 13). Up to and until September 2015, deliveries to Kinray customers were made by large couriers such as UPS, FedEx, LTL and TXX, or pursuant to IC Agreements with Routeholders. (SOMF at ¶ 16).

### B.   Routeholders Signed Independent Contractor Agreements Governing the Parties' Relationship

Routeholders executed an IC Agreement each time they agreed to service a route. (SOMF at ¶ 37).[3] The IC Agreement, which was prepared by Defendants' legal counsel, set forth

---

[2] Such goods include products classified as "controlled substances" by the United States Drug Enforcement Administration ("DEA"). (SOMF at ¶ 56). Custody of controlled substances is heavily regulated by the DEA and by the states of New York and New Jersey. The relevant DEA regulations require "effective controls and procedures to guard against theft and diversion of controlled substances," including that the distributor secure controlled substances with locks and an alarm system, grant access only to specifically authorized individuals, and ensure that the substances are packed in unmarked containers and transported accordingly. 21 C.F.R. §§ 1301.71, 1301.77.

[3] Bellwether Routeholders executed IC Agreements for the routes they served, and contrary to Plaintiffs' assertion to the contrary, they were provided copies of the IC Agreement. In fact, many Bellwether Routeholders produced copies of their IC Agreements in discovery. (See DKT 327 ("Dec. 30, 2016 Ekelman Aff."), Exs. AG, AK, AM, AN).

the terms of the Parties' relationship.  (SOMF at ¶ 38).  When a Routeholder executed an IC Agreement, the Routeholder committed to service a route by making deliveries in a geographic area to a number of Kinray customers.  (SOMF at ¶ 40).  The IC Agreements identified whether the route was designated to be performed on weekday mornings, weekday afternoons or Saturdays. (SOMF at ¶ 47).  Routeholders' contractual commitment was to ensure that a driver reported to Kinray at an appointed time to pick up merchandise, deliver the merchandise to customers on a "time is of the essence" basis, and return manifests, any merchandise that was rejected, and packing materials to Kinray.  (SOMF at ¶¶ 40–41).  The Routeholder was not required to perform personally—only to ensure that a driver serviced the route.  (SOMF at ¶ 44).

In September 2013, pursuant to 30-day notices issued pursuant to the IC Agreements, Kinray cancelled a substantial number of contracts with Routeholders and transitioned the deliveries to affected customers to a third party.  (SOMF at ¶ 17).  In September 2015, Kinray terminated additional Routeholder contracts, again by providing 30 days written notice, such that Kinray is no longer a party to Routeholder contracts.  (SOMF at ¶¶ 18, 19).

The terms of the IC Agreement, and the execution of these agreements, are not in dispute and clearly establish an independent contractor relationship:

- Routeholders were responsible for deliveries on their route which required transporting products from Kinray's warehouse to the customer, and returning merchandise and signed manifests to Kinray (SOMF at ¶¶ 37, 40);

- Deliveries were on a "time is of the essence" basis, and "Absent a specific customer requested delivery time" morning deliveries were to be completed by noon and afternoon deliveries by 6:00 pm.  Contractors selected the order of delivery (SOMF at ¶¶ 42, 47–49);

- Personal service was not required, and all Bellwether Routeholders engaged helpers to service their route(s).  Indeed, Routeholder Coello did not personally perform *any* delivery

3

services during the limitations period, relying exclusively on helpers to fulfill his contractual obligations; Bellwether Plaintiff Gamarra retained eight different helpers (SOMF at ¶¶ 37, 44, 82, 101, 116–19, 121, 133, 137, 147–49, 151–53, 168, 171, 184);

- Routeholders determined whether to engage Helpers and had the unfettered right to hire, fire, supervise, train, discipline, schedule, pay and assign tasks to their Helpers without oversight from Kinray (SOMF at ¶ 82);

- Routeholders could, and did, provide services to other businesses, including delivery services in competition with Kinray. For example, seven of the nine Bellwether Routeholders had other sources of income during the limitations period, and of those seven, four engaged in deliveries for other delivery companies (SOMF at ¶¶ 43, 68–69, 90, 134, 140–41, 155–57, 163, 189);[4]

- Routeholders bore all expenses, including: motor vehicles, gas, tolls, equipment, maintenance, inspections and licensing, telephone charges, insurance, cell phones, pagers or other similar equipment, and payments to helpers (SOMF at ¶¶ 42, 45, 51);

- Routeholders did not receive employee benefits or tax withholdings (SOMF at ¶¶ 55, 71);

- Routeholders received no Kinray training, and trained their own helpers (SOMF at ¶ 45);

- The IC Agreement was terminable by either Party on 30 days' notice (SOMF at ¶¶ 17–18);

- Routeholders were not issued a uniform or vehicle signage, or required to wear Kinray identification while engaged in deliveries (SOMF at ¶ 53);

- Routeholders' deliveries were not monitored by a GPS; nor were Routeholders required to communicate with Kinray each time they completed a delivery (SOMF at ¶ 63);

---

[4] Bellwether Routeholder Coello was engaged by Kenan Transport (SOMF at ¶ 99); Miguel Bautista by Late Night Transport (SOMF at ¶ 134), Julio Gomes by Federal Express, Suburban Home Pharmacy and Suburban Medical (SOMF at ¶¶ 140–41); and David Villarejo by Continental Courier. (SOMF at ¶ 189).

- Routeholders were solely responsible for the merchandise delivered and for financial loss associated with theft or breakage (SOMF at ¶ 50);

- Routeholders were free to obtain and use any motor vehicle for their business (SOMF at ¶¶ 42, 51, 73–74);

- Routeholders were free to accept or decline contracts; if a Routeholder did not agree to the terms of a proposed IC Agreement, the Routeholder could decline the offered contract (Defendants' Counterstatement of Material Facts ("CSOMF") at ¶ 111).

## C.   Routeholders Operated Independent Businesses.

Consistent with the terms of the IC Agreements, Bellwether Routeholders conducted their business as a true enterprise, and sought to profit from their contractual arrangement with Kinray. Kinray paid four of the Bellwether Routeholders through their corporate entities, which in turn paid the individual Routeholders. (SOMF at ¶¶ 113, 143–44, 170, 177, 182, 187). For example, Bellwether Routeholder Gamarra's corporate entity was paid by Kinray, then paid Gamarra a salary for work he performed for the corporate entity. (SOMF at ¶ 181).

All of the Bellwether Routeholders, including those who did not maintain corporate entities, filed income tax returns as sole proprietorships, and accepted the tax benefits of itemizing the deductions attributable to the cost of the business operations. (SOMF at ¶¶ 112, 126, 128, 135, 142, 160, 166, 169, 180, 190). All Bellwether Routeholders deducted the costs of their business operations from their earnings, reaping significant tax savings. (SOMF at ¶ 112, 126, 128, 135, 142, 160, 166, 169, 180, 190). Such deducted costs included payments to employees and for contract labor, vehicle expenses, insurance, gas, and parking. (SOMF at ¶¶ 112, 126, 128, 135, 142, 160, 166, 169, 180, 190). Consistent with their status as a separate business entity, Bellwether Routeholders issued IRS form 1099s to their Helpers. (SOMF at ¶¶ 107, 108, 109, 110, 111, 116, 117, 118, 120, 121, 175). Bellwether Routeholders profited by retaining Helpers and paying the

Helpers less than the amount that Kinray paid the Routeholder to service the route. (SOMF at ¶¶ 102, 122). Bellwether Routeholder Coello, for example, paid his helpers less than the amount Kinray paid him to service the routes and required that his Helpers use their own vehicles and pay all the expenses associated with performing the deliveries. (SOMF at ¶¶ 102, 104, 105). Likewise Bellwether Routeholder Fernandez paid Helpers he engaged to service his routes less than the amount he was paid by Kinray in order to profit from the routes. (SOMF at ¶ 122).

### D.   Routeholders Contracted with Helpers, Kinray Did Not.

As they were not parties to the IC Agreements, Bellwether Helpers had an even more attenuated relationship to Defendants—they were retained directly by Routeholders. (SOMF at ¶ 82, 192, 199, 207, 225–26, 237–38, 240–41, 250–51, 263–64, 268). Kinray's only involvement with Helpers was verifying they were authorized to drive and did not have a criminal history which would prevent them from making deliveries, as many shipments contain controlled substances. (SOMF at ¶¶ 57, 60). Defendants did not compensate Helpers or provide Helpers with any benefits offered to employees. (SOMF at ¶¶ 82–83, 85, 104).

There is no dispute as to the material facts relating to the relationship between Kinray and the Bellwether Helpers:

- Routeholders identified and selected Helpers (SOMF at ¶ 82);
- Routeholders determined if and how to pay the Helpers (SOMF at ¶¶ 83, 254, 266);
- Helpers typically received a weekly or daily fee that they negotiated with Routeholders and Defendants did not compensate Helpers retained by Routeholders (SOMF at ¶¶ 83–84);
- Bellwether Helpers determined the order in which they made deliveries (SOMF at ¶ 70);
- If directed by the Routeholder, Bellwether Helpers used their own vehicles to make deliveries, and were responsible for gas, insurance, tolls and other costs associated with providing services (SOMF at ¶ 87);

6

- Kinray did not require Helpers to use any particular model vehicle (SOMF at ¶ 104);

- Some Bellwether Helpers used vehicles provided by the Routeholder (SOMF at ¶ 88);

- Routeholders (not Kinray) trained and directed the Helpers (SOMF at ¶¶ 91, 92, 95, 179);

- Kinray did not use a GPS or other system to monitor Helpers (SOMF at ¶ 63);

- Helpers were not restricted from providing services to other businesses; of the ten Bellwether Helpers, seven had other sources of income during the limitations period. (SOMF at ¶¶ 197–98, 205, 208–09, 231, 243–45, 255–61, 269–70).

Like the Bellwether Routeholders, the Bellwether Helpers conducted their delivery business as a true business operation. Six of the ten Bellwether Helpers provided service to multiple Routeholders during the limitations period; Helper Neil Guzman provided services to eight Routeholders, Helpers Arthur Fernandez and Maria Romero each served five Routeholders, and Helper Freddy Vasquez served four Routeholders. Each Bellwether Helper who filed tax returns filed as a sole proprietor, itemizing deductions attributable to their business operation expenses, such as, vehicles, insurance, fuel and tolls. (SOMF at ¶¶ 193, 223, 230, 236, 248–49, 262, 267, 274). Many of the Routeholders who engaged the Bellwether Helpers issued IRS form 1099s to the Bellwether Helpers. (SOMF at ¶¶ 211–13, 220–22, 234–35, 246, 273).

## II.   **LEGAL STANDARD**

"The Court must grant a motion for summary judgment if the pleadings, discovery material before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *See Forbes v. Lighthouse Int'l*, No. 11 Civ. 7065, 2013 U.S. Dist. LEXIS 62454, at *12 (S.D.N.Y. May 1, 2013) (citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A genuine dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the non-moving party." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). The party

opposing summary judgment may not rely on conclusory allegations or unsubstantiated speculation. *Salahuddin v. Goord*, 467 F. 3d 263, 273 (2d Cir. 2006). It is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc., v. W.R. Grace & Co.*, 77 F. 3d 603, 615 (2d Cir. 1996).

Moreover, not every factual dispute is material under substantive law. Only factual disputes that might affect the outcome properly preclude summary judgment. *See Affrunti v. Long Island Univ.*, 2005 U.S. App. LEXIS 12372, at *3 (2d Cir. June 22, 2005) (a fact is "material" if it affects the outcome of the suit and an issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate." *Forbes*, 2013 U.S. Dist. LEXIS 62454, at *13 (citations omitted). Plaintiffs cannot establish a genuine material issue of fact, and summary judgment is appropriate.

## III. **THERE ARE NO DISPUTED FACTS AS TO CONTRACTOR STATUS**

The Bellwether Plaintiffs determined whether to provide delivery services and the method and means of performing the work. Routeholders were solely responsible for identifying and selecting Helpers, and exercised total independence in determining whether and how they serviced Kinray's customers. The Bellwether Plaintiffs filed tax returns as independent contractors and took substantial business deductions reflecting business operations.[5] The IC Agreements explicitly stated that Routeholders were independent contractors, and many of the Bellwether Routeholders formed corporations to operate their businesses. (SOMF at ¶¶ 8, 39). These uncontroverted facts

---

[5] With the exception of Bellwether Helper Guzman for whom no income tax information was produced.

compel a finding that the Bellwether Plaintiffs were independent contractors.  *See Saleem v. Corporate Transportation Group, Ltd., et al.*, 2017 U.S. App. LEXIS 6305, at *21 (2d Cir. 2017).

## A.   Plaintiffs were Independent Contractors under the FLSA.

New York courts have consistently found owner-operators providing delivery or other driving services to be properly classified as contractors under the FLSA.  Most recently, the Second Circuit affirmed the dismissal of the claims of black-car drivers, ruling that the drivers were properly designated as independent contractors.  *Saleem*, 2017 U.S. App. LEXIS 6305, at *3.  The *Saleem* drivers were found to meet the economic reality test first articulated in *United States v. Silk*, 331 U. S. 704, 716 (1947).  *Silk* set out those factors as:

> (1) The degree of control exercised by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Saleem*, 2017 U.S. App. LEXIS 6305, at *13 n.19.[6]  As the below chart summarizes, the undisputed facts regarding the Routeholder-Kinray relationship are analogous to the facts in *Silk*, *Saleem*, and *Browning*, where the courts found no employment relationship existed.[7]

---

[6] *See also Arena v. Delux Transp. Servs.*, 3 F. Supp. 3d 1, 10–14 (E.D.N.Y. 2014); *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 597–607 (E.D.N.Y. 2012); *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 305–08 (E.D.N.Y. 2009).

[7] Any reliance on *Thomas v. TXX Servs.*, 2016 U.S. App. LEXIS 19429 (2d Cir. Oct. 25, 2016), reversing a grant of summary judgment "On this record" in another delivery case, is misplaced; the record included no depositions.

| Comparison of *Silk* Factors as applied in *Saleem*, *Browning* and the instant matter | | | |
|---|---|---|---|
| *Silk*[8] | *Saleem*[9] | *Browning*[10] | *Kinray*[11] |
| **Factor One: The degree of control exercised by the employer over the workers** | | | |
| 1. Drivers could accept or reject routes. | 1. Drivers could accept or reject work. | 1. Drivers could decline work with notice to CEVA. | 1. Drivers (Routeholder or assigned Helper) could accept or reject new routes or routes from Routeholders. |
| 2. Drivers could retain helpers. | 2. Drivers could retain helpers. | 2. Drivers could retain helpers. | 2. Drivers (Routeholder or assigned Helper) could retain helpers. |
| 3. No prohibition on competition. | 3. Limited anti-competition provision. | 3. No prohibition on competition. | 3. No prohibition on competition. |
| 4. No prohibition on other work. | 4. No prohibition on other work. | 4. No prohibition on other work. | 4. No prohibition on other work. |
| 5. Drivers provided services to others. | 5. Drivers provided services to others. | 5. No evidence driver did other work. | 5. Drivers (Routeholder or assigned Helper) provided services to others and/or held other jobs. |
| 6. Drivers could elect not to provide services. | 6. Drivers could elect not to provide services. | 6. Drivers could elect not to provide services. | 6. Drivers (Routeholder or assigned Helper) |

[8] 1. *Silk*, 331 U.S. at 706–07; 2. *Id.* at 716, 719; 3. *Id.* at 706–07, 719; 4. *Id.* at 706–07, 719; 5. *Id.* at 706–07, 719; 6. *Id.* at 706; 7. *Id.* at 705–22; 8. *Id.* at 716; 9. *Id.* at 709–10, 716; 10. *Id.* at 709; 11. *Id.* at 705–22; 13. *Id.* at 705–07; 14. *Id.* at 708, 716; 15. *Id.* at 708, 716; 16. *Id.* at 716, 719; 17. *Id.* at 706; 18. *Id.* at 706, 708, 719; 19. *Id.* at 706–07, 719; 21. *Id.* at 716, 719; 22. *Id.* at 709; 24. *Id.* at 716.

[9] 1. *Saleem*, 2017 U.S. App. LEXIS 6305, at *8, n.13, 26-27; 2. *Id.* at *20; 3. *Id.* at *6, 15–18, 23; 4. *Id.* at *8, 16–17; 5. *Id.* at *8; 6. *Id.* at *20; 7. *Id.* at *6–7; 8. *Id.* at *8, n.13; 9. *Id.* at *6–7; 10. *Saleem*, 52 F. Supp. 3d 526, 538; 11. *Id.* at 538–39; 13. *Saleem*, 2017 U.S. App. LEXIS 6305, at *15-16, n.22; 14. *Id.* at *15–16, n.22; 15. *Id.* at *22–23; nn. 30, 32; 16. *Id.* at *20; 17. *Saleem*, 52 F. Supp. 3d 526, 530; 18. *Saleem*, 2017 U.S. App. LEXIS 6305, at *22-23, nn. 30, 32; 19. *Id.* at *8, 16–17; 20. *Id.* at *15; 21. *Id.* at *6–8, 15–18, 23, 27; 22. *Id.* at *15; 23. *Id.* at *15; 24. *Saleem*, 52 F. Supp. 3d 526, 542–43.

[10] 1. *Browning*, 885 F. Supp. 2d at 593; 2. *Id.* at 610; 3. *Id.* at 593; 4. *Id.* at 603; 5. *Id.* at 593, 603; 6. *Id.* at 593, 600–01; 7. *Id.* at 592, 603–04; 8. *Id.* at 593; 9. *Id.* at 593; 10. *Id.* at 593, 607; 12. *Id.* at 593, 600, 602; 13. *Id.* at 594; 14. *Id.* at 594; 15. *Id.* at 592; 16. *Id.* at 610; 17. *Id.* at 594; 18. *Id.* at 608; 19. *Id.* at 603; 20. *Id.* at 592, 594–96; 21. *Id.* at 608–09; 22. *Id.* at 609–10; 23. *Id.* at 609–10; 24. *Id.* at 610.

[11] 1. SOMF at ¶¶ 31, 217; 2. *Id.* at ¶¶ 8, 45, 82, 216–17; 3. *Id.* at ¶¶ 43; 4. *Id.* at ¶¶ 43, 68–69; 5. *Id.* at ¶¶ 43, 68–69, 197–98, 205, 231–32, 243–45, 255–61, 269–70; 6. *Id.* at ¶ 82; 7. *Id.* at ¶¶ 53–54, 89–90; 8. *Id.* at ¶¶ 42, 70, 82; 9. CSOMF at ¶ 181; 10. SOMF at ¶¶ 45, 82; 11. *Id.* at ¶ 63; 12. CSOMF at ¶¶ 44, 170–71, 206–08, 388; 13. SOMF at ¶¶ 68, 71, 86; 14. *Id.* at ¶¶ 112, 126, 128, 135, 142, 160, 166, 169, 180, 190; 15. *Id.* at ¶¶ 42, 45, 51; 16. *Id.* at ¶¶ 44–45, 82; 17. CSOMF at ¶ 118; 18. SOMF at ¶ 72; 19. *Id.* at ¶ 68; 20. *Id.* at ¶¶ 113, 143–44, 170, 177, 182, 187; 21. *Id.* at ¶¶ 8, 42, 45, 68–69, 82, 102, 104, 122, 139, 165, 178; CSOMF at ¶ 53, 67, 87, 137; 22. SOMF at ¶¶ 17–18, 24; CSOMF at ¶ 154; 23. CSOMF at ¶ 140; 24. SOMF at ¶¶ 12–14, 16–19.

| Comparison of *Silk* Factors as applied in *Saleem*, *Browning* and the instant matter | | | |
|---|---|---|---|
| *Silk[8]* | *Saleem[9]* | *Browning[10]* | *Kinray[11]* |
| | | | could elect not to self-perform if a helper was secured. |
| 7. No discussion of company insignia in *Silk*. | 7. Logo on car | 7. Logo on truck and clothing. | 7. No company insignia on clothes or vehicles. |
| 8. Drivers decided routes for delivery. | 8. Drivers decided route for delivery. | 8. Drivers decided the routes for delivery. | 8. Drivers (Routeholder or assigned Helper) decided route for delivery (not required to follow the order of the manifest). |
| 9. Drivers were issued instruction manual. | 9. Drivers were issued a Rulebook. | 9. Drivers were issued certain instructions pertaining to performance of the Agreements. | 9. Drivers (Routeholder or assigned Helper) were issued security rules and other sporadic memoranda regarding security and delivery protocols. |
| 10. Drivers were required to complete a short course of instruction. | 10. Drivers received a short training session. | 10. Drivers required to attend monthly meetings. | 10. No training by Company, no regular meetings. |
| 11. No GPS. | 11. GPS not used except in response to customer issue, drivers in constant contact with dispatcher. | | 11. No GPS supervision. |
| | | 12. Once delivery was accepted, it had to be delivered on a timely basis. | 12. Driver (but not Routeholder) must deliver to customer pursuant to a "time is of the essence" standard. |
| **Factor 2: The workers' opportunity for profit or loss and their investment in the business** | | | |
| 13. Issued 1099s. | 13. Issued 1099s. | 13. Issued 1099s. | 13. Issued 1099s. |

| Comparison of *Silk* Factors as applied in *Saleem*, *Browning* and the instant matter | | | |
|---|---|---|---|
| *Silk*[8] | *Saleem*[9] | *Browning*[10] | *Kinray*[11] |
| 14. Took deductions as business entity. | 14. Took deductions as business entity. | 14. Took deductions as business entity. | 14. Took deductions as business entity. |
| 15. Drivers paid all expenses of operation. | 15. Drivers paid all expenses of operation. | 15. Drivers paid all expenses of operation. | 15. Drivers (Routeholder or assigned Helper) paid all expenses of operation. |
| 16. Could hire helper. | 16. Could hire helper. | 16. Could hire helper. | 16. Could and did hire helpers. |
| 17. Paid per ton of material delivered. | 17. Paid per trip. | 17. Paid per delivery. | 17. Paid per route and number of deliveries. |
| 18. Made substantial investments in vehicles. | 18. Made substantial investments in vehicles. | 18. Made substantial investments in vehicles. | 18. Made substantial investments in vehicles. |
| 19. Could work for other enterprises. | 19. Could work for other enterprises. | 19. Could work for other enterprises. | 19. Could work for other enterprises. |
| | 20. Some drivers formed corporations. | 20. Some drivers formed corporations. | 20. Some drivers formed corporations |
| **Factor 3: The degree of skill and independent initiative required to perform the work** | | | |
| 21. Drivers hired helpers, and depend on their own initiative, judgment, and energy for their success. | 21. Drivers could secure fares for CTG customers in multiple ways; they could decide when to drive; and/or could drive for different dispatch services. | 21. Driving skills, business management skills, and freight hauling skills were required. | 21. Driving skills, freight handling skills, business management skills required; Routeholders elected whether to self-perform and/or hire helpers, drive for other Routeholders, or engage in other business endeavors. Elected whether to grow the scope of their delivery enterprise. Those making deliveries determined delivery route for |

| Comparison of *Silk* Factors as applied in *Saleem*, *Browning* and the instant matter | | | |
|---|---|---|---|
| *Silk*[8] | *Saleem*[9] | *Browning*[10] | *Kinray*[11] |
| | | | maximum efficiency. |
| **Factor 4: The permanence or duration of the working relationship** | | | |
| 22. Contract was terminable at will. | 22. Contract terminable at will, with notice. | 22. Terminable with 30 days' written notice. | 22. Terminable with 30 days' notice. |
| | 23. Indefinite term | 23. Successive one year agreements. | 23. Multi-year contract of varying length. |
| **Factor 5: The extent to which the work is an integral part of the employer's business** | | | |
| 24. Shipping was integral part of business, but could be readily replaced. | 24. Black car drivers are the core of the business but readily replaced. | 24. Delivery was integral to the business but drivers could readily be replaced. | 24. Delivery is a necessary function, so to that extent it is an integral part of the business, but all Routeholders have been replaced. |

### 1. Kinray Did Not Exercise Control Over Routeholders or Deliveries.

Routeholders were in business for themselves. Routeholders independently determined whether they would undertake responsibility for multiple routes, hire Helpers to perform services or self-perform, and the extent to which they would engage in other business opportunities during the same time they were under contract with Kinray. The Routeholders controlled their operations.

### a. Bellwether Routeholders independently determined the extent to which they would rely on Helpers to service routes.

Routeholders determined whether the routes would be handled by a Routeholder or a Helper. Indeed, the uncontroverted fact that Routeholders could, and did retain Helpers to meet their contractual obligations is a critical factor supporting their status as contractors. *See Silk*, 331 U.S. at 718 (the truck drivers hiring of their own helpers supported the independent contractor finding). Routeholders agreed to service a particular route each day the route was scheduled for delivery. But, the Routeholders were given complete freedom to elect to personally service the route or retain a Helper to complete the work. Routeholders' IC Agreements established a

13

commitment to ensure their route was serviced, not a commitment the Routeholder personally service the route.  Like the plaintiffs in *Silk*, *Saleem*, and *Browning*—who could decide whether to provide services at any time—Routeholders could also determine whether they would perform the driving services or hire a helper to do so at any particular time.  Routeholders were free to divide their time as they saw fit between servicing their IC Agreements, hiring others to service their IC Agreements, helping other Routeholders service their IC Agreements, or securing revenue from other sources.[12]  Kinray had no control over the Routeholders' decisions in this regard.

The uncontroverted facts establish that the Bellwether Routeholders determined how their routes would be serviced.  Routeholders determined how much time they personally spent engaged in servicing the routes they were committed to service pursuant to their IC Agreements, how much time they spent helping other Routeholders meet their contractual obligations, and, how much time they spent engaged in other business endeavors, including providing delivery services to other businesses.  For example, Bellwether Routeholder Coello retained Helpers to perform all delivery services for Kinray and never once drove one of the routes he was contracted for during the limitations period.  (SOMF at ¶¶ 98–101).  Over the course of six years Coello paid one Helper over $218,000.00.  (SOMF at ¶ 107).  Coello paid a corporate entity that provided Helper services over $83,000.00 over three tax years.  (SOMF at ¶ 109).

Similarly, Bellwether Routeholder Fernandez and/or the corporate entity he owned relied substantially on Helpers to meet his obligations to Kinray.  Bellwether Routeholder Fernandez and/or the entity he owned were party to seven IC Agreements during the limitations period.  (SOMF at ¶ 114).[13]  Routeholder Fernandez determined how to staff these routes and engaged five

---

[12] Bellwether Routeholders could also serve as a Helper to other Routeholders.  (CSOMF at ¶¶ 67, 87, 137, 336–38).
[13] It would not have been possible for a single person to simultaneously drive seven routes.  (SOMF at ¶ 47) (routes were designated to be delivered in one of three time windows: weekday mornings, weekday afternoons, or Saturdays).

different Helpers in order to meet his contractual obligations to Kinray. (SOMF at ¶¶ 116). He paid some Helpers by the day, and others by the week, and required all but one Helper to assume the cost of making deliveries (vehicles, gas, tolls, etc.). (SOMF at ¶¶ 116–21, 123).

Bellwether Routeholder Narvaez was a party to IC Agreements for only three routes but retained Helpers to meet his obligations to Kinray. In 2011, Bellwether Narvaez engaged Bellwether Helper Guzman to provide delivery services and paid him a weekly fee. (SOMF at ¶ 148). That same year, Bellwether Routeholder Narvaez retained the services of another Helper, Maritza Taverez, to accompany Narvaez while he made deliveries to Kinray customers, and paid her $23,300.00. (SOMF at ¶¶ 149–50). The decision to retain a Helper to assist him while he engaged in delivery services was a business decision that Bellwether Narvaez made—for whatever reason he determined it was helpful for him to engage a Helper not to handle the route, but to work with him on the route. (SOMF at ¶ 150). Narvaez provided driving services as a Helper to other Routeholders in addition to meeting the obligations of his IC Agreements. (SOMF at ¶¶ 145, 154).

That Routeholders were required to provide a driver to report to Kinray to pick up merchandise and deliver the merchandise to a specified number of customers does not mean that Kinray controlled their business. *Luxama v. Ironbound Express, Inc.,* 2012 U.S. Dist. LEXIS 9929, at *10–12 (D.N.J. Jun. 28, 2012) (finding evidence that "drivers are told where to report to work, what they will be paid and where to pick up and deliver" products unavailing and deeming same drivers to be independent contractors under the FLSA because "the fact that a person is required to be at a given place at a given time or assigned work [is not] sufficient to support an employee-employer relationship"); *Stull v. Noble Logistics Servs.,* No. C064308 (Cal. App. Jun. 8, 2011) (analyzing whether alleged employer exercised control over an owner-operator who provided equipment and personnel necessary to complete transportation and delivery services and confirming independent contractor status of owner-operator despite the fact the alleged employer

15

provided the owner-operator with delivery window times within which to complete deliveries).

The IC Agreements were not personal service agreements. The fact that all of the Bellwether Routeholders retained workers to assist with their operations is a factor that weighs heavily in favor of a finding of contractor status. Retaining Helpers allowed the Bellwether Routeholders to work at their own convenience. Courts have consistently concluded that the ability to hire others strongly points to a finding that the relationship between the Routeholder and Kinray was that of an independent contractor. *Silk*, 331 U.S. at 718; *Saleem*, 2017 U.S. App. LEXIS 6305, at *20; *Browning*, 885 F. Supp. 2d at 601.

> **b.   Bellwether Routeholders controlled the manner in which they fulfilled their contractual obligations.**

Kinray did not control the manner in which Routeholders made deliveries. Routeholders were free to use any vehicle make or model for deliveries (SOMF at ¶ 73) and their activities were not tracked by GPS. (SOMF at ¶ 63). Routeholders could contact Kinray's customers directly when they needed to communicate with a customer (the customers' phone numbers were on the manifests). (SOMF at ¶ 75). Routeholders could determine the order in which deliveries were made, (SOMF at ¶ 70) and the route they took to each delivery destination. (SOMF at ¶ 42). Routeholders could and did supplement their income by taking on other business opportunities or other employment, and could even compete with Kinray and provide delivery services to Kinray's competitors. (SOMF at ¶¶ 43, 68–69). Even though Kinray imposed certain time limits as to when merchandise was to be picked up and delivered, these requirements were imposed as a result of the nature of Kinray's business. (SOMF at ¶ 26). In *Browning*, Judge Spatt discussed this very point, and determined that "[i]t is reasonable that a company such as CEVA would impose boundaries of this nature in the shipping business." 885 F. Supp. 2d at 602 (citing *Velu*, 666 F. Supp. 2d at 307). Thus, to the extent Kinray required a Routeholder or Helper be present to pick

16

up merchandise at an appointed time, and deliver the merchandise in a "time is of the essence" manner, this does not constitute control inconsistent with an independent contractor relationship.

Plaintiffs will argue that the existence of security rules issued by Kinray is evidence of control. But establishing security rules or protocols associated with the delivery of goods does not negate the independent contractor relationship. *Carrell v. Sunland Const., Inc.*, 989 F.2d 330, 332 (5th Cir. 1993) (where customers dictated the particular manner or method of the work, this did not make the plaintiffs employees of the defendant); *Taylor v. Waddell & Reed, Inc.*, 2012 WL 3584942, at *5 n.9 (S.D. Cal, Aug. 20, 2012) ("[C]ompliance with legal requirements is not indicative of control for purposes of establishing an employer-employee relationship."). The safety rules and memos issued to Routeholders identified basic security protocols such as locking vehicle doors when transporting merchandise so as to avoid theft of product. (Plaintiff's Opposing Statement of Material Facts ("POSOMF") at Ex. 53, p. 3). The memos also explained that some of the merchandise they delivered included controlled substances so it could only be delivered to the address on the manifest. (POSOMF at Ex. 54, p. 10). Like the Rulebooks in *Saleem*, which included a dress code and rules of conduct, the existence of rules did not lessen the degree of autonomy each Routeholder enjoyed. *Saleem v. Corp. Transp. Group, Ltd.*, 2017 U.S. App. LEXIS 6305, at *6–7.

Similarly, Plaintiffs' contention that Routeholders lacked the ability to negotiate the terms of the IC Agreements is not true. Routeholders could and did negotiate the rates they were paid for their services. (SOMF at ¶¶ 31, 46, 115).[14] Even if Routeholders could not negotiate the price

---

[14] In his declaration, Routeholder Fernandez claims "I was never given the opportunity to negotiate the rate I was paid by Kinray" and that when he "attempted to negotiate the rate for a route . . . [he] was flatly denied." (F. Fernandez Decl. at ¶¶ 95–96). Contrastingly, at deposition, Routeholder Fernandez testified that he negotiated an increase from $40 to $60 for the base rate on the E8 route. (SOMF at ¶¶ 31, 115). Routeholder Fernandez's declaration also states that there was "no process whereby drivers could bid for the opportunity to drive a route for Kinray." (F. Fernandez Decl. at ¶ 104). However, at deposition, he stated that he was able to bid on routes. (CSOMF at ¶ 142).

they were paid for making deliveries on a particular route or any other term in the IC Agreement, this would not impact on their status as independent contractors. They determined whether to accept or reject those terms. In *Saleem*, for example, the defendant dispatch operators determined the terms of the plaintiff black-car driver's franchise agreements, including the rates the plaintiff black-car drivers would be paid for each particular job. The fact that the black-car drivers in *Saleem* could not alter any of the terms of the franchise agreement did not affect their status as business operators. *Saleem*, 2017 U.S. App. LEXIS 6305, at *14–16.

Finally, there is no dispute that Bellwether Routeholders determined the order in which they made deliveries on their routes, and that Kinray did not monitor the manifests in order to review the order in which deliveries were made on routes. Bellwether Routeholders Narvaez, Gomez, Franco, Velasquez, Villarejo, and Gamarra and Bellwether Helpers Dorado, A. Fernandez, Ocampo, Rodriguez, and Aguirre all testified they could and did select the order of deliveries on routes. (SOMF at ¶ 70).[15] This testimony is consistent with the terms of the IC Agreements, and the testimony of Defendants' witnesses. (SOMF at ¶¶ 42, 70).[16] Further, there is no dispute that Kinray did not monitor delivery times as reflected on manifests. (SOMF at ¶ 28). Delivery times recorded on manifests were reviewed when a customer raised an issue regarding a delivery.

---

[15] In an effort to create a disputed fact, Plaintiffs submitted declarations from a few Bellwether Plaintiffs who contradicted their prior sworn deposition testimony on this point. For instance, in his declaration, Helper Guzman testified that he had no say in the sequence of deliveries, that the order for deliveries was set by Kinray, and that he was expected to follow that order. (Guzman Decl. at ¶¶ 56, 62, 65). However, Guzman testified at deposition that he did not deliver merchandise in the order provided for in the manifests. (SOMF at ¶ 70). Thus, there is no dispute that Routeholders and Helpers could select the order of delivery.

[16] Because the declarations are inconsistent with prior testimony they should not be afforded any weight. In addition, their uniformity is further grounds for giving the declarations limited weight. *See Augustyniak v. Lowe's Home Ctr., LLC*, 2016 U.S. Dist. LEXIS 15112, at *9–10 (W.D.N.Y. Feb. 8, 2016) (stating that "[w]hile 'the mere fact that the declarations submitted by Plaintiff are virtually identical does not ipso facto render them incompetent' . . . , it severely undercuts their persuasive value"); *Guifu Li v. A. Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 516 (N.D. Cal. 2010) ("The Court does not find Defendants' submission of nearly-identical declarations . . . to be credible"); *Dale v. Dretke*, 2005 U.S. Dist. LEXIS 33926, at *3 (E.D. Tex. 2005) ("The number of separate, but substantially identical, affidavits in support of Petitioner's claim detracts from the credibility of their content"). Of the seven declarations submitted by Plaintiffs, the number of paragraphs in each declaration that are identical to paragraphs in other declarations ranges from 70% to 92%. These high percentages undercut the persuasive value of the declarations and detracts from the reliability of statements contained therein.

18

(CSOMF at ¶¶ 202–04).  Responding to customer complaints in this fashion does not constitute consistent review of delivery times, but is rather part of the customer service provided to customers.  (CSOMF at ¶¶ 202–04).  Indeed, in *Saleem*, the District Court noted that limited monitoring utilizing GPS technology as part of an investigation of customer complaints does not constitute control of the manner in which the services were provided by drivers.  *Saleem*, 52. F. Supp. 3d 526, 538 (S.D.N.Y. 2014).

c.    <u>**Bellwether Routeholders were free to determine the extent of their relationship with Kinray.**</u>

Routeholders determined how much business they wished to conduct with Kinray.  The number of IC Agreements to which each Bellwether Routeholder was party varied from as few as two to as many as seven.  (SOMF at ¶¶ 80, 100, 114, 132, 136, 145, 162, 167, 183).  There was no limit to the number of IC Agreements a Routeholder could be a party to.  (CSOMF at ¶ 163).  Plaintiffs' contention that Routeholders were not permitted to decline the offer of a new route for fear of being penalized in some way must be rejected.  There is no record evidence that any Routeholder was ever penalized for refusing the offer of a new IC Agreement.  That a Routeholder might have feared the loss of existing routes if an additional route was not accepted is of no significance in the absence of any evidence that Kinray in fact cancelled IC Agreements under such circumstances.  *See Browning*, 885 F. Supp. 2d at 600–01 (there is no evidence in the record to indicate that Plaintiffs were in fact "penalized" for turning down assignments).

Bellwether Routeholders also determined the extent to which they secured income from other sources while under contract with Kinray.  Six of the nine Bellwether Routeholders earned income from other sources, including other delivery services.  (SOMF at ¶¶ 99, 112, 134, 140–41, 155–58, 163, 189).  Bellwether Routeholder Coello, for example, received substantial income— more than $100,000 in many years—from Keenan Transportation (SOMF at ¶¶ 99, 112); Bautista

19

received income from Late Night Transportation (SOMF at ¶¶ 134–35); Gomez received income from Federal Express, Suburban Home Pharmacy, and Suburban Medical (SOMF at ¶¶ 140, 142); Narvaez received income from several sources as an employee and provided delivery services to Quintanilla Trucking (SOMF at ¶¶ 154–60); Franco received wage income from other sources (SOMF at ¶¶ 162–63); and Villarejo received income from Continental Courier as well as from the corporate entity he created for his Kinray business (SOMF at ¶¶ 188–90).

That the Bellwether Routeholders worked for others is consistent with their status as independent contractors. *Meyer v. United States Tennis Ass'n*, 2014 U.S. Dist. LEXIS 128209, at *27 (S.D.N.Y. Sept. 11, 2014) ("Plaintiffs were also free to engage in other employment as is evidenced by the fact that while they officiated for the USTA, many of them held jobs unrelated to tennis, and freely officiated at other non-USTA tournaments.") *aff'd*, 2015 U.S. App. LEXIS 11037, (2d Cir. N.Y. June 29, 2015); *Sellers v. Royal Bank of Can.*, 2014 U.S. Dist. LEXIS 4563, 19–20 (S.D.N.Y. Jan. 8, 2014) ("[t]he comparison of the time spent on each contract is legally meaningless; the dispositive point is that plaintiff was, indeed, free to engage in other employment . . . . Because plaintiff was free to accept other employment and did so, he had a significant opportunity for profit or loss through his consulting company.") (internal quotes omitted) *aff'd*, 2015 U.S. App. LEXIS 1884 (2d Cir. Feb. 6, 2015) (summary order).

## 2.   Bellwether Routeholders Made Substantial Investment and Had Substantial Opportunity for Profit or Loss.

Bellwether Routeholders made significant investments in their business operations.  Kinray did not provide Routeholders with any of the equipment required to meet the obligations of the IC Agreements.  Routeholders were required to purchase or lease appropriate vehicles, and were responsible for all maintenance of the vehicles and expenses, including insurance, fuel, tolls and labor.  (SOMF at ¶¶ 51–52).  The vehicles purchased by Routeholders and used during the

20

limitations period cost each Routeholder tens of thousands of dollars.   (SOMF at ¶ 72). Routeholder Gamarra, for example, spent over $25,000.00 purchasing vehicles; Routeholder Villarejo over $26,000.00, Routeholder Bautista over $24,000.00 and Routeholder Velasquez over $30,000.00.   (SOMF at ¶ 72).   Courts evaluating service providers using vehicles that they own have consistently concluded that this investment supports independent contractor status. *See Saleem*, 2017 U.S. App. LEXIS 6305, at *22 n.30; *Browning*, 885 F. Supp. 2d at 608 (plaintiffs used their own vehicles and tools, and were responsible for costs and expenses associated with the vehicles, and were properly classified as independent contractors); *Mateo v. Universal Language Corp.*, 2015 U.S. Dist. LEXIS 128377, at *4 (E.D.N.Y. Sept. 23, 2015).   In addition, the Bellwether Routeholders tax returns reveal a substantial outlay of financial resources beyond the vehicle purchase, including cellular phones, car and truck expenses, insurance, gasoline, parking, tolls and tools.   (SOMF at ¶¶ 126, 128, 135, 142, 160, 166, 169, 180, 190).

The Bellwether Routeholders ran businesses with substantial revenue.   Routeholder Coello's gross revenue for the period beginning in 2009 exceeded over $200,000 each year, and was as high as $256,933 in 2011.   (SOMF at ¶ 112).   Bellwether Routeholders Fernandez, Velasquez and Gamarra's gross revenue also exceeded $100,000 in most years covered by this litigation.   (SOMF at ¶¶ 126, 169, 180).   Other Routeholders operated businesses of even larger scope, and received annual payments from Kinray of over $500,000.00 in connection with their delivery business.   (SOMF at ¶ 81).   Unquestionably, Routeholders had the ability to build substantial businesses, and generate profits.

### 3.   Fulfilling the Delivery Contracts Required Skill and Substantial Initiative.

Routeholders organized their businesses to maximize their revenue and profits.   Bellwether Routeholders engaged Helpers at rates below that paid by Kinray, in order to increase profits.

Other Routeholders required the Helpers to supply their own equipment and cover their own expenses. (SOMF at ¶¶ 102, 104, 122, 139, 165, 178). In electing to retain Helpers who were required to cover the expenses of providing delivery services, and paying the Helpers less than the amount received by Kinray, these Routeholders exercised business acumen to profit from their contractor relationship. The details as to the Bellwether Routeholders' individual businesses demonstrate a broad range of business models, all demonstrating Routeholders were free to define the manner in which they operated their business. Bellwether Routeholders determined how many IC Agreements (number of routes) to commit to, whether to self-perform their routes or hire others to do so, and whether to engage in other business activities and expand reliance on Helpers. Routeholders retained Helpers to assist them in performing the work, some electing to self-perform along with the Helpers, and others relying completely on Helpers to meet their obligations.

Further, it is undisputed that every Bellwether Routeholder sought significant tax benefits associated with their independent contractor status. Indeed, every Routeholder identified significant deductions on their tax returns, whether they filed as a sole proprietor, or incorporated a business which received payments directly from Kinray. (SOMF at ¶¶ 112, 126, 128, 135, 142, 160, 166, 169, 180, 190).[17] This uncontroverted fact weighs heavily in favor of independent contractor status. Indeed, a substantial number of Routeholders issued IRS 1099 forms to their Helpers. (SOMF at ¶¶ 107–11, 116–18, 120, 124–25, 175, 186). Further, many Routeholders' income tax returns reflected substantial payments to contract labor (SOMF at ¶¶ 112, 126, 128, 161, 166, 190) or the payment of wages to individuals. (SOMF at ¶¶ 161, 180–81, 186). That the Bellwether Routeholders universally secured significant tax benefits as sole proprietors or business owners is compelling. As the *Browning* Court noted, such conduct "'[t]hough not quite rising to

---

[17] Routeholders Gamarra and Villarejo incorporated driving businesses during the limitations period and directed that the corporations receive monies from Kinray. (SOMF at ¶¶ 177, 181, 187).

the level of estoppel . . . may significantly impede the plaintiffs' ability to claim employee status for purposes of filing an overtime or minimum wage claim.'" 885 F. Supp. 2d at 605, quoting *Deboissiere v. Am. Mod. Agency*, 2010 U.S. Dist. LEXIS 113776, (E.D.N.Y. Oct. 22, 2010) (quoting *Gagen v. Kipany Prods., Ltd.*, 27 A.D.3d 1042 (N.Y. App. Div. 3d Dep't Mar. 30, 2006)).

### 4.     The Duration of the Relationship Does Not Militate Against Contractor Status.

While the IC Agreements included term provisions that ranged from two years to eleven years, all of the IC Agreements included a 30 day termination provision which allowed either party to end the relationship without cause or reason.  (SOMF at ¶¶ 17–18; CSOMF at ¶ 140).  The 30 day termination provision was available to both parties.  *Id.*  The existence of the cancellation provision along with the fact that Routeholders were free to drive for competitors or other businesses, demonstrate that Kinray had very little ability to exercise control over the Routeholders.  Indeed, in *Saleem*, the Second Circuit noted that because the franchise agreements signed by the black-car drivers provided drivers with the ability to terminate their agreements with consent of the franchisor, and could provide services to competitors, even in the face of long term relationships, "the termination provisions constituted a significant restriction on the ability of Franchisor Defendants to exercise control."  *Saleem*, 2017 U.S. App. LEXIS 6305, at *15; *see Browning*, 885 F. Supp. at 609.

### 5.     The Routeholders Services were not Integral to Kinray's Business.

Kinray is a pharmaceutical wholesaler.  It purchases pharmaceuticals from manufacturers and then, pursuant to franchise agreements that it secures, resells the pharmaceuticals to independent pharmacy retailers.  (SOMF at ¶¶ 10, 12).  While Kinray, like any wholesaler, must deliver its product to retailers who buy it, it is not a transportation company.  Indeed, the fact that Kinray severed all of its IC Agreements with Routeholders and now delivers products exclusively

23

through bonded couriers demonstrates transportation is not its core business and can be provided by any number of vendors, which can be changed at any time. (SOMF at ¶¶ 16–19). This factor supports the Bellwethers' status as independent contractors. *See Browning*, 885 F. Supp. 2d at 610 (while the plaintiffs' delivery work was an integral part of the defendant's business because the services provided by the plaintiff contractors could be readily performed by others, and they were thus easily replaceable, this factor did not weigh against contractor status), (*citing Velu*, 666 F. Supp.2d at 307–08); *Preacely v. AAA Typing & Resume, Inc.*, 2014 U.S. Dist. LEXIS 182946, at *8 (S.D.N.Y., Apr. 28, 2014), *aff'd*, 2015 U.S. Dist. LEXIS 33684 (S.D.N.Y. Mar. 18, 2015) (plaintiff word processor was properly designated as an independent contractor because the work was "'interchangeable with the work of other[s]'" and this factor weighed only slightly in favor of plaintiff); *Arena v. Plandome Taxi Inc.*, 2014 U.S. Dist. LEXIS 51967, at *7 (while drivers are indispensable to a transportation business, plaintiff was a dispensable driver, since he was replaced by others, such that this factor did not impact the Court's independent contractor analysis).

### B.   Helpers were Engaged by Routeholders, Not Defendants.

Kinray had no direct relationship with the Bellwether Helpers.[18]  Routeholders decided *whether* to retain Helpers (SOMF at ¶ 82), *which* Helpers to retain (SOMF at ¶¶ 45, 82), which routes the Helpers would service (SOMF at ¶ 82), and whether the Helper would make the deliveries alone or with another Helper. (SOMF at ¶¶ 82, 149–50). Routeholders paid the Bellwether Helpers pursuant to arrangements made exclusively between them. Some Bellwether Helpers were paid by the day (SOMF at ¶¶ 194, 200, 204), others were paid a weekly fee (SOMF at ¶ 210), and two were not paid at all. (SOMF at ¶¶ 254, 266). Some Bellwether Helpers were issued IRS 1099 forms from the Routeholders who retained them (SOMF at ¶¶ 206, 221–22, 234,

---

[18] With the exception that Bellwether Helper Maria Romero became a Routeholder and was a party to an IC Agreement. (SOMF at ¶ 196).

246–47), others received cash not reflected in a tax form.  (SOMF at ¶¶ 194, 204, 229, 239).

Helpers took direction from Routeholders who retained them.  (SOMF at ¶¶ 45, 92).  Like the Bellwether Routeholders, the Bellwether Helpers did not receive any training from Kinray (SOMF at ¶¶ 45, 82, 91, 95), were not required to wear uniforms with Kinray insignia or drive vehicles identified as providing services to Kinray.  (SOMF at ¶¶ 53–54).  Kinray's only involvement in the Routeholders' retention of Helpers was to conduct a background check to verify that the Helper held a valid drivers' license and did not have a history of criminal convictions. (SOMF at ¶ 60).  Routeholders had the unfettered right to determine the extent of their reliance upon Helpers to meet their contractual obligations (SOMF at ¶ 82), choose the Helpers, assign duties to Helpers, and compensate (or not) Helpers.  (SOMF at ¶¶ 45, 82–84, 86).  Accordingly, the undisputed facts establish Bellwether Helpers were properly classified as contractors.

## C.    Plaintiffs were Independent Contractors Under the NYLL

Under New York law, the analysis regarding Plaintiffs' status is even easier.  In New York courts analyze the degree of control exercised by the purported employer to determine whether an individual is an employee or an independent contractor.  To make the determination, courts weigh five factors: whether the individual "(1) worked at his [or her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule." *Deboissiere*, 2010 U.S. Dist. LEXIS 113776, at *8.  In addition to these factors, New York courts give significant consideration to how plaintiffs identified their business relationships with Kinray for tax purposes and whether they sought tax benefits associated with independent contractor status. *Id.* at *4.

Here, as a matter of law, the Bellwether Plaintiffs were properly classified as contractors. There is no dispute that the Bellwether Plaintiffs worked at their own convenience, because they alone chose whether to drive a route or retain a Helper to do so.  (SOMF at ¶ 82).  There also is no

25

dispute that the Bellwether Plaintiffs could, and did in fact engage in other business endeavors, including other delivery businesses. (SOMF at ¶¶ 68–69). No Bellwether Plaintiff received fringe benefits. (SOMF at ¶¶ 39, 55). No Bellwether Plaintiff was on Kinray's payroll. (SOMF at ¶ 55). Finally, the Bellwether Routeholders were not on a fixed schedule because they could decide whether to self-perform the delivery services. (SOMF at ¶ 82). *See, e.g.*, *Velu*, 666 F. Supp. 2d at 306–07 (citing *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003)).[19]

## IV.  EVEN IF ROUTEHOLDERS OR HELPERS WERE EMPLOYEES (WHICH THEY WERE NOT), BELLWETHER PLAINTIFFS WERE EXEMPT FROM OVERTIME AS "LOCAL DRIVERS"

The FLSA exempts from overtime anyone employed "as a driver or driver's helper making local deliveries . . . compensated . . . on the basis of trip rates." 29 U.S.C. § 213(b)(11). The NYLL adopts this exemption. 12 NYCRR 142-2.2. There can be no dispute that Plaintiffs were drivers and driver's helpers making local deliveries compensated by trip rates. Routeholders were paid based on negotiated trip and "per stop" rates. (SOMF at ¶ 46; Dec. 30, 2016 Ekelman Aff., Exs. AG–AO ¶ 2) (IC Agreements reflect different "base" trip rates and "per stop" rates). They made local deliveries. (SOMF at ¶ 46; Dec. 30, 2016 Ekelman Aff., Ex. BU) (reflecting deliveries from Kinray in Queens to various places throughout the New York City area).

The exemption's only additional requirement is that "the Secretary [of Labor] . . . find that such [compensation] plan has the general purpose and effect of reducing hours worked by such employees to, or below, the maximum workweek," i.e., forty hours. The evidentiary record is

---

[19] Plaintiffs make no claim for minimum wages. To the extent Plaintiffs' claim under NYLL § 193 relates to purported "tools of the trade" requirements, it fails because such claim can only lie where such purported transactions brought an individual's wages below the minimum wage. *Lin v. Benihana Nat'l Corp.*, 2010 U.S. Dist. LEXIS 132871, *15–17 (S.D.N.Y. Nov. 9, 2010). Plaintiffs make no claim for minimum wage. Plaintiffs' claim for failure to provide notice pursuant to NYLL § 195 fails because, inter alia, Plaintiffs' respective relationships with Kinray (if deemed "employees") commenced prior to the enactment of the requirement. *Canelas v. A'Mangiare Inc.*, 2015 U.S. Dist. LEXIS 66316 (S.D.N.Y. May 14, 2015) (no claim under notice provision for those who commenced work before April 9, 2011). In order to prevail on their claims, Named Plaintiffs must first establish that they are employees of Defendants entitled to the protections of the FLSA and NYLL. *Bharat v. Brookhaven Mem. Hosp. Aded Ctr. Inc.*, 687 N.Y.S.2d 667, 669 (N.Y, App. Div. 1999).

clear that the compensation structure of the IC Agreement—i.e., paying on a base rate and per stop rate, rather than hourly or other method—incentivized faster completion of deliveries. (SOMF at ¶¶ 46, 48–49, 70; CSOMF at ¶¶ 118).[20]  Furthermore, this structure is substantially identical to delivery pay plans approved by the Department of Labor pursuant to this exemption. *See* Affirmation of Felice Ekelman Dated June 6, 2017 at Ex. A (opinion letters approving pay plan and underlying pay plan reflecting day rate plus "per bottle" rate).[21]  Defendants are aware of no case authority declining to apply this exemption based on purported non-compliance with the recordkeeping requirements set forth in 29 C.F.R. § 516.15.  Such a ruling would be inappropriate here where: 1) the function of the exemption clearly is met (and the Secretary clearly has so found); and, 2) any failure to maintain records was based on a *bona fide* and good faith belief that the exempt local drivers properly were classified as contractors.

## V.    KINRAY'S DECISION TO CLASSIFY PLAINTIFFS AS "NON-EMPLOYEES" WAS MADE IN GOOD FAITH AND THUS LIQUIDATED DAMAGES ARE NOT APPROPRIATE

Kinray has been aware of the issue of classification of owner-operators for decades, at least since a 1973 decision of the New York State Department of Labor that an owner-operator who provided delivery services to Kinray properly was classified.  (SOMF at ¶ 97).  From that time, Kinray's classification of delivery drivers has been repeatedly upheld by New York agencies, and, recently, by a New York state court judge.  (SOMF at ¶ 97; DKT 211) (decision in *Dieterich v. Munoz, et al.*, Index No. 7372/2011 (Dutchess Sup. Ct. June 26, 2014)).  The IC Agreement—and the practices and policies it embodies—was drafted for Kinray by counsel.  (SOMF at ¶ 38).

---

[20] In other words, the payment structure clearly "decoupled [compensation] from actual time worked." *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 509 (7th Cir. Ill. Mar. 13, 2007)(upholding application of FLSA's 7(i) commissioned overtime exemption to car repair technicians based in part on finding that commission structure encouraged faster completion of jobs because the "faster the team works, the more it earns per number of hours").

[21] Plaintiffs may argue that Kinray did not adhere to the strict letter of the implementing regulation for this exemption. 29 CFR § 516.15. Where, as here, any failure to do so was based on Kinray's good faith belief that the individuals in question were independent contractors, the Court should apply the exemption based on its purpose.

Where an employer shows to the satisfaction of the Court the act or omission was in good faith and that it had reasonable grounds for believing its act or omission was not a violation of the FLSA, the Court may, "in its sound discretion" award no liquidated damages.  29 U.S.C.S. § 260.[22]  New York courts have found good faith when, even where finding liability based on a "close call" or ambiguous requirement of the FLSA, the employer demonstrated attentiveness to the issue. *Purdy v. Aero-Expeditors, Inc.*, 1967 U.S. Dist. LEXIS 11479 (E.D.N.Y. Mar. 9, 1967)(though sole member of export department found to be misclassified as exempt, employer acted in good faith based on reasonable belief that employee so qualified); *Prue v. Hudson Falls Post No. 574*, 2016 U.S. Dist. LEXIS 96985 (N.D.N.Y. July 26, 2016)(declining to award liquidated damages based on finding that employer reasonably believed Plaintiff qualified for executive exemption from overtime); *El v. Potter*, 2004 U.S. Dist. LEXIS 24447 at*23 (S.D.N.Y. Dec. 6, 2004)(plaintiffs' claim for liquidated damages failed as a matter of law since the employer acted in good faith).

Kinray's use of the IC Agreement and classification of individuals thereunder as contractors was in good faith.  Legally, Kinray had successfully defended the classification on multiple occasions, and, factually, it engaged specialized labor counsel to draft the IC Agreement governing the relationship.  There is, simply, no evidence to the contrary, and summary judgment is appropriate as to such claimed damages.

---

[22] The NYLL also contains a good faith defense, NYLL §§ 198(1-a), the product of two recent amendments which numerous courts have held were intended to harmonize the NYLL with the FLSA. *Sun v. China 1221, Inc.*, 2016 U.S. Dist. LEXIS 52292, at *9 (S.D.N.Y. Apr. 19, 2016)(collecting cases).  Both of these amendments impact this case, as the NYLL limitations period extends back to September 4, 2007.  Prior to November 25, 2009, as discussed below, it was an employee's burden to establish willfulness in order for an award of liquidated damages to attach.  Prior to April 9, 2011, liquidated damages under the NYLL were measured as 25% of underpaid wages, not 100%.  Thus, this discussion concerns Plaintiffs' claims for liquidated damages under the FLSA, and their claims for liquidated damages for the period outside the respective FLSA limitations period on or after November 25, 2009.  It is now axiomatic that liquidated damages under both laws never could be awarded on Plaintiffs' claims accruing within the FLSA limitations period. *Tarazona v. Rotana Cafe & Rest. Inc.*, 2017 U.S. Dist. LEXIS 78274, at *22 (E.D.N.Y. May 23, 2017) (citing *Muhammed Chowdhury v. Hamza Express Food Corp.*, 2016 U.S. App. LEXIS 21870 (2d Cir. Dec. 7, 2016)).

**VI.    THERE IS NO EVIDENCE OF WILLFULNESS AND THUS THE LIMITATIONS
PERIOD UNDER THE FLSA IS TWO YEARS, AND NYLL LIQUIDATED
DAMAGES ARE NOT APPROPRIATE PRIOR TO NOVEMBER 24, 2009**

FLSA regulations provide that a violation shall be deemed "willful" "where the employer

knew that its conduct was prohibited by the Act or showed reckless disregard for the requirements

of the Act. 29 C.F.R. § 578.3.  Plaintiffs bear the burden of proving that the employer "either knew

or showed reckless disregard for the matter of whether its conduct was prohibited by the Act."

*Wong* v. *Hunda Glass Corp.,* 09 Civ. 4402 (RLE), 2010 U.S. Dist. LEXIS 62653, at *6 (S.D.N.Y.

June 22, 2010) (citing *Howard* v. *Port Authority,* 684 F. Supp. 2d 409 (S.D.N.Y. 2010)).  Mere

negligence is "insufficient" to show "willfulness." *Id.* (citing *Young* v. *Cooper Cameron Corp.,*

586 F.3d 201, 207 (2d Cir. 2009)).[23]  For the same reasons discussed above, and because Plaintiffs

have failed to adduce any evidence whatsoever that Defendants knowingly or recklessly violated

the FLSA, Defendants are entitled to summary judgment that they have not acted willfully under

the FLSA or the NYLL. *Kadden v. Visualex, LLC*, 2012 U.S. Dist. LEXIS 151800 (S.D.N.Y. Oct.

22, 2012) (misclassification of employee as exempt was in good faith and not willful).

As set forth above, discovery demonstrates that Kinray took affirmative steps to ensure a

bona fide contracting arrangement governed by the IC Agreement.  The Company's classification

has been upheld repeatedly over time.  Even assuming *arguendo* that Defendants misclassified one

or more Bellwether Plaintiffs, Plaintiffs can point to no evidence necessary to meet their burden

to show that Defendants acted *recklessly* in so doing. *See Clarke v. JPMorgan Chase Bank, N.A.,*

08 Civ. 2400 (CM)(DCF), 2010 U.S. Dist. LEXIS 33264 at *27 (S.D.N.Y. Mar. 26, 2010)

("Reckless disregard . . . involves actual knowledge of a legal requirement, and deliberate disregard

---

[23] "The FLSA willfulness standard 'does not differ appreciably' from the NYLL standard." *Wong,* 2010 U.S. Dist.
LEXIS 62653, at *6 (quoting *Moon* v. *Kwon.,* 248 F. Supp. 2d 201, 235 (S.D.N.Y. Sept. 9, 2002)).

of the risk that one is in violation.") (internal quotation omitted).

## VII.   DEFENDANTS DID NOT RETALIATE AGAINST PLAINTIFF FERNANDEZ

Plaintiff Fernandez alleges that Kinray terminated a route contract in response to his participation in this lawsuit.  This claim fails both because 1) as a contractor Plaintiff Fernandez was outside the protections of the FLSA and NYLL anti-retaliation provisions; and, 2) Kinray has submitted unrebutted evidence that its termination of contracts—in September 2013 and September 2015—was done *en masse* as part of Kinray's wholesale migration of delivery services to a freight broker, and not for any retaliatory purpose.  (SOMF at ¶¶ 17–19).[24]

### CONCLUSION

For the foregoing reasons, Routeholders were independent contractors who contracted with Kinray, and Helpers were contractors of those contractors.  Neither group were employees of Kinray, and the Bellwether Plaintiffs' claims should be dismissed with prejudice.

Dated: New York, New York
       June 8, 2017

Respectfully submitted,

JACKSON LEWIS P.C.
*ATTORNEYS FOR DEFENDANTS*
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

By:

FELICE B. EKELMAN, ESQ.
NOEL P. TRIPP, ESQ.
LAURA M. BEDSON, ESQ.

---

[24] *Pierre v. Air Serv Sec.*, 2016 U.S. Dist. LEXIS 128891 *29-30 (E.D.N.Y. Sept. 21, 2016)(summary judgment dismissing FLSA and NYLL retaliation claims where Plaintiff offered no evidence in response to employer's proffered business justification).

30