**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**FREDDY FERNANDEZ, LUIS VELASQUEZ, and
GIOVANNY GONZALEZ, on behalf of themselves and
all others similarly situated,**

          **Plaintiffs,**

    -against-

**KINRAY, INC. and CARDINAL HEALTH, Inc.,**

          **Defendants.**

------------------------------------------------------------------------x

                              **INDEX NO:  13-CV-4938**

                                **DeArcy Hall, J.**

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

### JOSEPH & KIRSCHENBAUM LLP

D. Maimon Kirschenbaum
Josef Nussbaum
Lucas C. Buzzard
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640

*Attorneys for Plaintiffs*

<u>**TABLE OF CONTENTS**</u>

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     COUNTERSTATEMENT OF FACTS ....................................................................... 2

III.    ARGUMENT ............................................................................................................. 4

   A.    **The Record is Replete with Facts from Which a Reasonable Jury Could Find that
         the Bellwether Plaintiffs were Employees under the FLSA** ................................... 5

      1. Degree of Control ..................................................................................................... 6

         a.   The ICA created a multi-year obligation to service a particular route by making
              daily (or weekly) deliveries to pharmacies in a specific geographic area ................. 6

         b.   Defendants controlled the creation, terms, and conditions of the ICAs,
              including the geographic location of the routes, the number of stops,
              and the price ........................................................................................................... 10

         c.   Defendants exerted extra-contractual control over the selection, approval,
              payment, and replacement of Helpers ................................................................... 14

         d.   Defendants exerted extra-contractual control over the schedules of
              performing Routeholders and Helpers ................................................................... 16

         e.   Defendants exerted extra-contractual control over the manner and means
              by which Routeholders and Helpers performed their deliveries .............................. 19

         f.   Defendants, not Routeholders or Helpers, controlled the relationship with
              customers .............................................................................................................. 22

      2. Opportunity for Profit or Loss & Investment ......................................................... 22

      3. Degree of Skill & Independent Initiative ............................................................... 25

      4. Permanence and Duration of the Working Relationship ......................................... 26

      5. Routeholders and Helpers were an Integral Part of Kinray's Business ................... 27

   B.    **A Reasonable Jury Could Find that the Bellwether Plaintiffs were Employees
         Under New York Law.** ......................................................................................... 27

   C.    **Defendants Have Failed to Submit Evidence Demonstrating that they Complied
         with the Clear Regulatory Prerequisites to Claiming the FLSA's "Local Driver"**

**Exemption to the FLSA's Overtime Requirement.** ............................................................. 28

D. **Defendants' Motion for Summary Judgment with Respect to Liquidated Damages and the FLSA Statute of Limitations is not Properly Before the Court and Should be Denied** ........................................................................................................................ 29

E. **A Reasonable Jury Could Find that Defendants Retaliated against Plaintiff Fernandez**. ...................................................................................................................... 30

IV. **CONCLUSION**.................................................................................................................. **30**

# TABLE OF AUTHORITIES

## Cases

Ansoumana v. Gristede's Operating Corp.,
    225 F. Supp 2d 184, 191-192 (S.D.N.Y. 2003) ............................................................. 27

Arena v. Plandrome Taxi, Inc.,
    No. 12-cv-1078 (DRH), 2014 U.S. Dist. LEXIS 51967 (E.D.N.Y. Apr. 14, 2014)........ 23

Arnold v. Kanowsky,
    361 U.S. 388, 392 (1960)............................................................................................. 28

Artola v. MRC Express, Inc.,
    No. 14-cv-23219, 2015 U.S. Dist. LEXIS 130183 (S.D. Fla. Sept. 25, 2015) ................ 16

Barfield v. N.Y. City Hosps. Corp.,
    537 F.3d 132, 143-44 (2d Cir. 2008) ............................................................................. 4

Brock v. Mr. W Fireworks, Inc.,
    814 F.2d 1042, 1047 (5th Cir. 1987) ............................................................................. 5

Brock v. Superior Care, Inc,
    840 F.2d 1054, 1059 (2d Cir. 1988) ..................................................................... 5, 8, 19

Browning v. CEVA Freight, LLC,
    885 F. Supp. 2d 590 (E.D.NY. 2012) ................................................................... 7, 8, 19

Bynog v. Cipriani Grp. Inc.,
    1 N.Y.3d 193 (N.Y. 2003) ........................................................................................... 27

Campos v. Evdoxia Zopounidis,
    No. 09-cv-1138 (VLB), 2011 U.S. Dist. LEXIS 78905 (D. Ct. July 20, 2011) .......... 9, 25

Celotex Corp. v. Catrett,
    477 U.S. 317, 322 (1986).............................................................................................. 29

Collinge v. IntelliQuick Delivery, Inc.,
    No. 12-cv-824, 2015 U.S. Dist. LEXIS 35860 (D. Ariz. Mar. 23, 2015)....................... 12

Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,
    804 F.3d 178, 186 (2d Cir. 2015).................................................................................. 4

Dixon v. Zabka,
    No. 11 CV 982, 2014 U.S. Dist. LEXIS 159692 (D. Conn. Nov. 13, 2014).................... 27

*Dole v. Snell,*
  875 F.2d 802, 806 (10th Cit. 1989) ............................................................................ 9, 16

*Escamilla v. Nuyen*,
  No. 14-0852 (AK), 2016 U.S. Dist. LEXIS 180635 (D.D.C. Dec 30, 2016) .................. 11

*Ethelberth v. Choice Sec. Co.*,
  91 F. Supp. 3d 339 (E.D.N.Y. 2015) ........................................................................... 10

*Feingold v. New York,*,
  366 F.3d 138 (2d Cir. 2004) .......................................................................................... 4

*Ferreira v. Network Express, Inc.*,
  2007 U.S. Dist. LEXIS 103035 (M.D. Fla. Mar. 9, 2007) ............................................. 27

*Flores v. Velocity Express, LLC*,
  No. 12-cv-5790, 2017 U.S. Dist. LEXIS 62124 (N.D. Cal. Apr. 24, 2017) .......... 9, 12, 16

*Gayle v. Harry's Nurses Registry, Inc.*,
  594 Fed App'x 714 (2d Cir. Dec. 8, 2014) .................................................................... 23

*Gorzynski v. JetBlue Airways Corp.*,
  596 F.3d 93 (2d Cir. 2010) ........................................................................................... 30

*Greyvan Lines v. Harrison*,
  156 F.2d 412 (7th Cir. 1946) ........................................................................................ 14

*Gustafson v. Bell Atl. Corp.*,
  171 F. Supp. 2d 311 (S.D.N.Y. 2001) ................................................................ 23, 24, 25

*Hart v. Rick's Cabaret Int'l, Inc.*,
  967 F. Supp. 2d 901 (S.D.N.Y. 2013) ..................................................................... 20, 28

*Kaytor v. Elec. Boat Corp.*,
  609 F. 3d 537 (2d Cir. 2010) .......................................................................................... 4

*Keller v. Miri Microsystems LLC*,
  781 F.3d 799 (6th Cir. 2015) ............................................................................. 19, 25, 26

*Lee v. ABC Carpet & Home*,
  186 F. Supp. 2d 447, 455 (S.D.N.Y. 2002) ................................................................... 22

*Lewis v. ASAP Land Express, Inc.*,
  554 F. Supp. 2d at 1217, 1224 (D. Kan. 2008) ............................................................. 24

*Miroglio S.P.A. v. Conway Stores, Inc.,*
   No. 05-cv-121 (BSJ)(GWG), 2007 U.S. Dist. LEXIS 8034 (S.D.N.Y. Feb. 6, 2007) ..... 20

*Molina v. S. Fla. Express Bankserv, Inc.,*
   420 F. Supp. 2d 1276 (M.D. Fla. 2006) ........................................................................ 24

*Mullins v. City of New York,*
   626 F.3d 47 (2d Cir. 2010)............................................................................................ 30

*Rogoz v. City of Hartford*,
   796 F.3d 236, 246 (2d Cir. 2015)..................................................................................... 4

*Ruiz v. Affinity Logistics Corp.,*
   754 F.3d 1093, 1102-03 (9th Cir. 2014) ....................................................................... 16

*Sakacsi v. Quicksilver Delivery Sys.,*
   2007 U.S. Dist. LEXIS 88747 (M.D. Fla. Nov. 28, 2007) ............................................ 25

*Saleem v. Corp. Trans. Grp.*,
   854 F.3d 131 (2d Cir. 2017)................................................................................... *passim*

*Scantland v. Jeffry Knight, Inc.,*
   721 F.3d 1308, 1317 (11 Cir. 2013).............................................................. 16 19, 21, 26

*Thomas v. TXX Servs.*,
   663 Fed. App'x 86 (2d Cir. 2016) ......................................................................... *passim*

*Thompson v. Linda and A. Inc.,*
   779 F. Supp 2d 139 (D.D.C. 2011) ............................................................................... 20

*United States v. Payne,*
   591 F.3d 46, 58 (2d Cir. 2010)...................................................................................... 13

*United States v. Rosenwasser,*
   323 U.S. 360, 363 (1945)................................................................................................. 5

*United States v. Silk,*
   331 U.S. 704 (1947)............................................................................................... *passim*

*Velasquez v. Dig. Page, Inc.,*
   No. CV 11-3892, 2014 U.S. Dist. LEXIS 160999 (E.D.N.Y. Nov. 17, 2014) ................ 30

*Walling v. Twyeffort, Inc.,*
   158 F.2d 944, 947-48 (2d Cir. 1947) ............................................................................ 15

## Statutes & Regulations

29 U.S.C. § 203 ........................................................................................................... 5

29 U.S.C. § 213 ........................................................................................................... 28

29 C.F.R. § 551 ........................................................................................................... 28

## I.     PRELIMINARY STATEMENT

Plaintiffs have introduced ample evidence from which a reasonable juror could conclude that, as a matter of economic reality, they were employees of Defendants. Specifically, the drivers in this case who delivered Defendants' products depended on Defendants' business for the opportunity make those deliveries and were not in business for themselves. This is the hallmark of employee status under the Fair Labor Standards Act ("FLSA"). Plaintiffs' evidence demonstrates that drivers entered into multi-year arrangements with Defendants to perform an "integral part" of Defendants' business. Defendants controlled all terms of the relationship, the ability to share work with others, the timing and location of pickup and delivery, the number of daily deliveries, the price paid for making deliveries, the "rules and protocols" governing how those deliveries were to be completed, and the response to customer complaints about the deliveries. Faced with a nearly identical showing by plaintiffs in a very similar misclassification case also involving delivery drivers, the Second Circuit recently vacated an award of summary judgment in favor of defendants. *See Thomas v. TXX Servs.*, 663 Fed. App'x 86, 88 (2d Cir. 2016).

Despite the unavoidable similarities between this case and *Thomas*, Defendants have completely ignored its straightforward and unsurprising conclusion that summary judgment is inappropriate where, as here, all material facts are disputed. Instead, Defendants' attempt, unsuccessfully, to present the illusion that no disputes exist as to whether the Plaintiffs were independent and free of its control. This illusion rests on two flawed premises. The first is Defendants' fiction that they adhered to the terms of their own contracts, the cold text of which best represents the working relationship. The second is the misconception that the overall relationship between Defendants and its delivery drivers should be viewed as a series of isolated, segmented occurrences, rather than in its totality. This flawed analysis contradicts every aspect of

the test used to determine employee status under the FLSA, which focuses not on fictive contractual descriptions, but on the economic *reality* of the whole relationship.  As the Plaintiffs' evidence shows, the reality is that Defendants devised and administered a system under which it ensured that those it termed "independent contractors" were actually subject to its control and economically dependent on its business.

## II.   COUNTERSTATEMENT OF FACTS

Plaintiffs incorporate by reference the entirety of their Local Rule 56.1 Counterstatement of Material Facts ("COMF") and Statement of Additional Facts, and highlight the following facts for the Court's convenience.[1]

Kinray, Inc. ("Kinray" or the "Company") is a pharmaceutical distributor that serves and delivers products to pharmacies in the New York metropolitan area.  RSAF ¶¶ 1, 2.  It operates out of a more than 200,000 square foot facility in Whitestone, Queens, where it employs some 435 unionized employees in its shipping warehouse that contains at least 20 different loading docks. *Id*. ¶¶ 423-26, 428-30.  Kinray contracts with pharmacies, guaranteeing their eligibility to receive deliveries of its products twice per day during the week and once on Saturdays.  *Id*. ¶ 5.  To facilitate its deliveries, Kinray designs delivery routes covering the pharmacies in specific geographic areas.  *Id*. ¶¶ 6, 8-10.  Kinray's business is extremely lucrative—in 2011, Defendant Cardinal Health purchased Kinray for approximately $1.3 Billion.  *Id*. ¶ 431.

Plaintiffs are a group of delivery drivers who delivered Kinray's merchandise on its routes. Some Plaintiffs worked exclusively for the Company for over 20 years, *id*. ¶¶ 4, 29-33, 67, 78, 81,

---

[1] When discussing evidence, this Memorandum cites to either (1) Plaintiffs' COMF, which contains the facts supplied by Defendants and Plaintiffs' responses; (2) Defendants' Response to Plaintiffs' Statement of Additional Facts ("RSAF"), which contains the facts supplied by Plaintiffs and Defendants' responses; or (3) the record evidence itself, in which case the citation is to the relevant Exhibit attached to either the Affirmation of Felice Ekelman (Defendants' counsel) or the Affirmations of Josef Nussbaum (Plaintiffs' counsel).

84, and many spent as long as 80-90 hours each week delivering its products, *id.* ¶¶ 255-56.[2] Kinray did not require Plaintiffs to have any prior experience or specialized skills in order to make its deliveries. *Id.* ¶¶ 28, 51-56. Some Plaintiffs entered into Independent Contractor Agreements ("ICAs") with the Company ("Routeholders"), while others delivered Kinray products without a contract ("Helpers"). Routeholders and Helpers are collectively referred to as "Drivers." Routeholders did not have any input into the terms of ICAs and were not given the opportunity to review the contracts prior to signing them.[3] *Id.* ¶ 142-50. While Routeholders could retain Helpers to driver their routes, their freedom to do so was restricted by Kinray, which had to approve any Helpers and required them to pass a background check. *Id.* ¶¶ 303-10. Helpers who delivered Kinray merchandise were subject to the same rules and restrictions as Kinray imposed on Routeholders. *Id.* ¶¶ 303-04, 321-322.

Kinray controlled the location and number of stops on all routes, and set the base and per-stop rates those routes paid. RSAF ¶¶ 6, 9-10, 156. By controlling the route composition and rates, Kinray controlled and predetermined Drivers' pay. *Id.* ¶¶ 161, 163. Once their van was loaded, Drivers had to make all stops on the route and were prohibited from deviating or making unauthorized stops once their vehicle was loaded. *Id.* ¶¶ 156-66, 174-205. Similarly, Kinray controlled Drivers' schedules by setting loading times, enforcing delivery times, and setting the times when Drivers could return merchandise. *Id.* ¶¶ 165-66, 183, 206-07, 210, 235-36, 238-51, 255-60, 265-70, 317. Moreover, while delivering Kinray's merchandise, Drivers were prohibited from carrying other cargo. *Id.* ¶¶ 389-90. Defendants controlled the relationship with their

---

[2] *See ,e.g.,* Fernandez Decl. at ¶129 ("Given my schedule for Kinray, under which I drove all day, was able to be called by Kinray at any point, and was required to bring undeliverable merchandise back to the warehouse after 10:30 p.m., it was virtually impossible for me to have any other form of employment.").
[3] For a description of the ICAs, *see* RASF ¶14-24.

pharmacy customers and prohibited Drivers from conducting an independent relationship with the pharmacies. *Id.* ¶¶ 418-22. Kinray also unilaterally issued numerous extra-contractual written rules and instructions, many of which threatened Drivers with discipline or termination if they were not followed. *Id.* ¶¶ 340-417. It was Kinray's sole decision how to classify Drivers for tax purposes. *Id.* ¶¶ 286-91.

## III.   ARGUMENT

"Summary judgment is appropriate only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "The burden is on the moving party to establish the absence of any material factual issues." *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). To defeat summary judgment, therefore, the non-moving party need only point to sufficient evidence in the record from which "a reasonable jury could find in the non-movant's favor." *Dean*, 804 F.3d at 186 (internal quotation marks omitted). In this analysis, the court "must *draw all reasonable inferences in the favor of the nonmoving party*, even though contrary inferences might reasonably be drawn." *Kaytor v. Elec. Boat Corp.*, 609 F. 3d 537, 545 (2d Cir. 2010) (internal citations and quotation marks omitted). Further, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Id.* (internal citations and quotation marks omitted). In sum, "[s]ummary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit, for the court in considering such a motion *must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (internal citations and quotation marks omitted).

### A. The Record is Replete with Facts from Which a Reasonable Jury Could Find that the Bellwether Plaintiffs were Employees under the FLSA

Under the FLSA, an "employee" is "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g). As the Supreme Court observed, "[a] broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945). To differentiate between employees, who are entitled to the protections of the FLSA, and independent contractors, who are not, the courts apply an "economic reality" test. This is a "fact-intensive" totality of the circumstances analysis, *Thomas*, 663 Fed. App'x at 88, in which "any relevant evidence may be considered," *Brock v. Superior Care, Inc*, 840 F.2d 1054, 1059 (2d Cir. 1988). It examines the entirety of the working relationship to determine "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service [(employees)] or are in business for themselves [(independent contractors)]." *Id.*

The Second Circuit has identified five nonexclusive factors that are "helpful in identifying" relevant to this analysis, *Saleem v. Corp. Trans. Grp.*, 854 F.3d 131, 140 n.20 (2d Cir. 2017), but are not to be mechanically applied, *id.* at 140. These factors are:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Superior Care*, 840 F.2d at 1058–59. "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts . . . is a question of law." *Id.* at 1059. As to each factor, "it is not what Plaintiffs *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Saleem*, 854 F.3d at 142 (quotation omitted).

The fact-intensive nature of the test means that questions of employee status cannot

typically be resolved on summary judgment. *Cf. Barfield v. N.Y. City Hosps. Corp.*, 537 F.3d 132, 143-44 (2d Cir. 2008) (applying the economic reality test in the joint employer context and noting that "[b]ecause of the fact-intensive character of a determination of joint employment, we rarely have occasion to review determinations made as a matter of law on an award of summary judgment"). This point was recently driven home in *Thomas*. There, the Second Circuit vacated a summary judgment decision where the district court improperly "resolved issues . . . of fact itself" and the parties disputed whether (1) "drivers could take breaks on their delivery routes without facing disciplinary action"; (2) the "plaintiffs were economically dependent on TXX"; (3) "TXX controlled plaintiffs and, if so, to what extent"; and (4) the drivers could "share work with others without TXX's approval." *Thomas*, 663 Fed. App'x at 89-90. Nearly identical disputes of fact preclude summary judgment here.

### 1. Degree of Control

From the terms of the ICAs themselves, which Defendants authored but only selectively followed, to the approval (and disapproval) of the use of Helpers, to the Drivers' schedules and daily performance, Defendants exerted control over every aspect of the relationship with one end goal—furthering their own business interests.

> a. <u>The ICA created a multi-year obligation to service a particular route by making daily (or weekly) deliveries to pharmacies in a specific geographic area</u>

The ICA "committed" a Routeholder to "service a route by making deliveries in a geographic area to a number of Kinray customers" every weekday morning, every weekday afternoon, or every Saturday. Defs.' Mem. at 3. For each ICA (with the exception of Extra ICAs), the specific route that was the subject of the ICA was identified in the ICA, thereby committing the executing Routeholder to service that specific route every week day (or every Saturday) for the

length of the ICA.  Ekelman Aff., Exs. AG-AO, CC.  This commitment lasted two years under the shortest ICAs; eleven years under the longest.  RSAF ¶¶ 140-41.  There is no dispute that approximately 85% of all Routeholders held ICAs committing them to service specific Kinray routes six days per week.  RSAF ¶ 19.

A major point running through Defendants' papers is that a Routeholder's ability to choose whether or not to accept the ICA itself and ability to retain a Helper to perform the Routeholder's obligation under an ICA and are is indicative of Defendants' lack of control.  *See* Defs.' Mot. at 10, 18.  Defendants liken these choices to the choices made by drivers to accept or reject work in three cases where courts have found independent contractor status.  *See* Defs.' Mem. at 10 (citing *United States v. Silk*, 331 U.S. 704 (1947); *Saleem*, 854 F.3d at 131; *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590 (E.D.N.Y. 2012)).  Defendants' analogy is inapt on two primary fronts.

First, the drivers' ability to accept or reject specific work in Defendants' cases *arose from the terms of the contract*, whereas the first "choice" identified by Defendants here is *whether to accept the contract at all*.  In each of Defendants' cases, the contractual terms allowed drivers to accept or reject individual, one-off jobs throughout the day *and retain their contract.  See Silk*, 331 U.S. at 706-07 (under contracts drivers waited until a being informed of a delivery job, then accepted or rejected that particular job); *Saleem*, 854 F.3d at 137 & n.13 (contracts allowed drivers to wait "until a work offer appeared on his phone," at which point they could "accept or decline the job"); *Browning*, 885 F. Supp. 2d at 600 (under contract terms, drivers placed on a daily "assignment list" and accepted or rejected a job when called by a dispatcher).  Here, after signing an ICA, a Routeholder was committed to ensure service to a route for the multi-year duration of the ICA and did *not* have the ability to choose whether or not their route would be serviced on any particular day.  PSAF ¶ 165.  This day-in, day-out, multi-year commitment drastically

differentiates this case from *Silk*, *Saleem*, and *Browning*—unlike in those cases, a potential Routeholder's decision to turn down a new route here meant turning down the ICA itself and, along with it, the opportunity to service and earn income from a particular daily route over the course of many years.  It was, in other words, a choice on the same order of magnitude as that a potential employee would have to make when faced with an offer of employment.  Indeed, this is exactly how Bellwether Plaintiff Julio Gomez framed the decision about whether to accept an ICA for one of his routes.  *See* Ekelman Aff., Ex. N (Gomez Dep.) at 123:25-124:6 ("I believe I took [the contract for the AL route] because it was available at the time.  I wanted to be employed.  I didn't want to be not employed.").

Second, Defendants place much stock in the in the fact that Routeholders did not have to personally perform the deliveries on a route but could instead retain Helpers to meet their contractual obligations.  It is axiomatic, however, that the FLSA does not have a minimum work requirement that must be met before an individual is entitled to its protections.  This is confirmed by *Superior Care*, where the Second Circuit found nurses to be employees even though they worked for the employer only several weeks out of the year, and the employer was not their "primary source of income."  *Superior Care*, 840 F.2d at 1060-61.  The consideration the Court found most relevant was not what the nurses did in the time they were not working for the company but, rather, the extent of the company's control over the nurses *while they were at work*.  *Id.* at 1060.   To be clear, Plaintiffs' focus in this case is the same—the extent of control exercised by Kinray over the Drivers (both Routeholders and Helpers) while they were *performing the service* of delivering Kinray's merchandise.  Thus, neither a (1) Routeholder's (or a Helper's) ability to not self-perform if they obtained Kinray's authorization to use a Helper as a substitute, *see infra* at 14-16 (discussing Helpers), nor (2) the fact that one Bellwether Routeholder (David Coello) did

8

not self-perform during the limitations period, is material to the question of whether the eighteen other Bellwether Plaintiffs were employees during the time *they* were self-performing and subject to Kinray's extensive control, discussed below. *Cf. Flores v. Velocity Express, LLC*, No. 12-cv-5790, 2017 U.S. Dist. LEXIS 62124, at *8-50 (N.D. Cal. Apr. 24, 2017) (finding that delivery drivers were employees despite the fact that they could and did retain "substitute drivers").

As set forth above, "it is not what Plaintiffs *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.'" *Saleem*, 854 F.3d at 142 (quotation omitted). When a driver in *Saleem* accepted one ride, his entire commitment to CTG was to complete that one ride, no more, no less. *See Saleem*, 854 F.3d at 137 n.13. By contrast, when a Routeholder or Helper appears at Kinray on any given morning to begin his route (at a time dictated by Kinray), he is committed and obligated to perform every single stop on the route and then bring any returns back to Kinray (again by a time dictated by Kinray). *See infra* at 16-19 (discussing Drivers' schedules). Thus, unlike *Saleem*, working on a Kinray route for one day necessarily involved a commitment to perform a series of tasks assembled and dictated by Kinray that lasted at least several hours. Such a chain of events, especially when performed on successive days over the course of multiple years, is what is known in common parlance as "employment." *See Saleem*, 854 F.3d at 147-48 (contrasting the facts of *Saleem* with those in *Dole v. Snell*, 998 F.2d 324, 327 (5th Cir. 1993), where workers were found to be employees when they were "expected to arrive at the premises at a particular hour [and were] prevented from leaving until they had decorated all the cakes to their bosses' satisfaction); *Campos v. Evdoxia Zopounidis*, No. 09-cv-1138 (VLB), 2011 U.S. Dist. LEXIS 78905, at *18 (D. Ct. July 20, 2011) (holding that a delivery driver was an employee where he "was required to make all assigned deliveries during his shift"); *see also* RSAF ¶¶ 57-60, 62-110 (detailing the number of years each Bellwether Plaintiff actually made deliveries

9

of Kinray merchandise, as well as those time periods when each worked exclusively for Kinray).

b. **Defendants controlled the creation, terms, and conditions of the ICAs, including the geographic location of the routes, the number of stops, and the price**

Defendants' ICAs, created by their attorneys, "set forth the terms of the Parties' relationship." Defs.' Mem. at 3. Plaintiffs have introduced substantial evidence that Defendants controlled every contractual term and that Routeholders had no meaningful ability to negotiate those terms. For example, Kinray created the geographic delivery area covered by an ICA and exclusively determined the number of pharmacies included as stops on that route. RSAF ¶¶ 6, 9-10, 156. Kinray could and did unilaterally change both the geographic area and the number of stops without notice to the Routeholders.[4] *Id.* ¶¶ 158-60. Drivers, in contrast, had no independent authority to add stops to their routes.[5] *Id.* ¶ 162. Because Routeholders were paid on a per-stop basis, Kinray's authority over route composition and number of stops meant it was the Company, not the Routeholders, who controlled the maximum amount of income any one route could generate. *Id.* ¶¶ 161, 163. Such control over compensation is highly indicative of a worker's employee status. *See, e.g.*, *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 350-51 (E.D.N.Y. 2015) (granting summary judgment to plaintiffs on employee status issue where, *inter alia*, employer controlled amount of compensation by limiting hours of work and setting rates of pay).

Numerous factual disputes also exist about whether and the extent to which Routeholders

---

[4] This practice, like many of Defendants' others, violated the terms of Defendants' own ICAs, which state that "neither party may change the Delivery Area without the written agreement of both parties." *See* Ekelman Aff. Exs. AG-AO, CC at ¶ 1(a). Defendants have produced no evidence that they ever obtained such written agreement.

[5] Defendants attempt to counter Plaintiffs' evidence that they could not negotiate the geographic and stop terms by truncating the deposition testimony of Plaintiff Arthur Fernandez who testified that his father, a Routeholder, "move[d] stops" between some of his routes. *See* RSAF ¶¶ 156-57 (citing A. Fernandez Dep. at 37:2-22). As Mr. Fernandez went on to explain, however, the procedure a Routeholder had to follow was to "suggest changes" to Kinray and then await the company's "authorization" before implementing those changes. A. Fernandez Dep. at 37:7-18, 113:15-114:12.

could negotiate what was (at least to them) the most important contractual terms—the rates of pay.

Defendants claim that when a route became available, Kinray employees posted the route details

on a bulletin board, after which prospective Routeholders submitted bids for the route.[6]  COMF ¶¶

29-30.  But Defendants' only support for this assertion is the testimony of their own Director of

Operations.  *Id.*  To be clear, despite claiming that they used a formal bid system for years,

Defendants have not produced a shred of documentary evidence, such as the route details posted

or actual bids received, that support its existence.  *Id.*  Plaintiffs dispute that there was any formal

bidding process, submitting evidence that, at least before this action was filed, Defendants farmed

out new routes by use of a list system, by approaching individual Drivers, or by seniority.[7]  *Id.*

Further, although Defendants contest Plaintiffs' evidence about whether they negotiated their rate

of pay, Defs.' Mem. at 17 n.14, the record shows that, at best, some Bellwethers occasionally asked

for rate increases (and were almost always turned down).  *See* COMF ¶¶ 30, 31; RSAF ¶¶ 112-15.

Of course, "employees and independent contractors alike may request pay increases" and, as a

number of courts have explained, "'one's ability to obtain a discretionary pay raise is not the type

of profit-maximizing 'managerial skill' that is characteristic of independent contractor status.'"

---

[6] Defendants rely only on the deposition testimony of their own witnesses for these facts—they have identified no documentary evidence, such as actual bids received from Routeholders, that support the existence of their purported bidding system.  COMF ¶¶ 29-30.

[7] Plaintiffs' evidence that they generally could not meaningfully negotiate the terms of the ICAs is supported by the additional evidence that Kinray (1) did not give Routeholders the opportunity to review the ICAs before signing, RSAF ¶ 143; (2) sometimes provided Routeholders only with the signature pages of the ICAs, *id.* ¶ 144; (3) provided the ICAs only in English despite the fact many Routeholders spoke Spanish and did not have the English proficiency necessary to understand the ICAs, *id.* ¶¶ 145-49; (4) pressured Routeholders to sign the ICAs immediately if they wished to continue working for Kinray, *id.* ¶¶ 151-52; and (5) prohibited Routeholders from discussing the terms of their ICAs with other Drivers, *id.* ¶ 153.  In addition to establishing that Routeholders could not meaningfully negotiate, these facts, if established at trial, would call into question whether the ICAs should be considered at all in the employee/independent contractor analysis.  *See, e.g.*, *Escamilla v. Nuyen*, No. 14-0852 (AK), 2016 U.S. Dist. LEXIS 180635, at *19 n.2 (D.D.C. Dec. 30, 2016) (declining to consider a purported independent contractor agreement where the trial testimony established: (1) plaintiff was told if he "did not sign the contract, Defendants would not assign him any work," (2) "Defendants did not give Plaintiff time to read the agreement or negotiate the terms," and (3) plaintiff "signed the contract because he wanted his job").

*Flores*, 2017 U.S. Dist. LEXIS 62124, at *43-44 (quoting *Collinge v. IntelliQuick Delivery, Inc.*, No. 12-cv-824, 2015 U.S. Dist. LEXIS 35860, at *18 (D. Ariz. Mar. 23, 2015)).

Defendants try to sidestep these factual disputes by relying on *Saleem* for the proposition that even if Routeholders were completely unable to "negotiate the price they were paid for making deliveries on a particular route or any other term of the IC Agreement, it would not impact on their status as independent contractors." Defs.' Mem. at 17-18. Specifically, Defendants assert that because in *Saleem* the inability of black-car drivers to negotiate the terms of their franchise agreements with dispatch operators "did not affect their status as business operators," the same result should obtain here. *Id.* at 18. It should not. The relationship between the black-car drivers and dispatch operators in *Saleem* is so fundamentally different from the relationship here that the situation in *Saleem*, which the Second Circuit explicitly cabined to its facts, is of little relevance to this case. *See Saleem*, 854 F.3d at 149 (noting the "narrow compass of [its] decision," which "conclude[d] only . . . that *these* Plaintiffs were not employees of *these* Defendants" and stating that, in a different case, "an entity that exercised similar control over clients, fees, and rules enforcement in ways analogous to the Defendants here might well constitute an employer" under the FLSA).

The crucial difference between *Saleem* and this case is that the defendant dispatch operator there ("CTG") was *providing a service* to the plaintiff black-car drivers who were, in return, *paying CTG* for that service. Specifically, CTG, using its proprietary platform or its contracts with large clients, procured customers committed to pay a sum certain fare for a ride. *Id.* at 136-37. Once procured, CTG effectively sold the right to collect that fare to the drivers who had bought or rented one of its franchise agreements. *Id.* at 137-38. Although CTG set the price of the sale, which it collected through fees assessed against the fare, the drivers retained the bulk of the fare the

customer paid, "in some cases up to 85%." *Id* at 138.   Thus, the mechanics were such that the customer paid the driver for providing a service, and the driver paid CTG for providing a service. It is not surprising that CTG's ability to set the price and terms of its service did not turn the drivers who purchased that service into its employees.

Those mechanics are a far cry from the relationship here, where the transaction is extremely simple—Routeholders provided a service to Defendants (the delivery of Defendants' merchandise to Defendants' customers along Defendants' routes), Defendants paid for that service, and it was Defendants' decision how much to pay.   Indeed, the situation here is nearly identical to that in *Thomas* where the defendants "engag[ed] drivers to deliver . . . freight to retailers." *Thomas*, 663 Fed. App'x at 87-88.   It is puzzling, and telling, that Defendants' only mention of *Thomas* – in a single sentence footnote – asks this Court to disregard a Second Circuit decision as close to directly on point as it is possible to be in such fact-specific cases.[8]   Defs.' Mot. at 9 n.7.   Defendants' reason for asking this Court to ignore *Thomas* – "the record included no depositions" –   is not only inaccurate, *see Thomas*, 663 Fed. App'x at 88 (noting that the plaintiffs took a Rule 30(b)(6) deposition), it is immaterial.   Nothing in *Thomas* suggests that its reversal of summary judgment was based on the *lack* of evidence or gaps in the record. *See generally id.* at 87-90.   Summary judgment was vacated because the record contained multiple disputed issues of fact that the district court improperly resolved itself. *See id.* at 89-90.   Here, where a more robust record demonstrates similar disputes of fact about the amount of control Defendants exercised over the content of the contract and Routeholders' compensation, there is no question that there is a triable issue of whether "plaintiffs were economically dependent on [Kinray]." *Thomas*, 663 Fed. App'x at 89.

---

[8] To be sure, although *Thomas* is a summary order, this "does not mean that the [Second Circuit] considers itself free to rule differently in similar cases." *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010).

       c.   Defendants exerted extra-contractual control over the selection, approval, payment, and replacement of Helpers

Defendants attempt to blunt the effect of the disputed facts above by pointing out that Routeholders could hire helpers to drive their routes instead of doing it themselves. Citing *Silk*, Defendants assert that the use of Helpers is a "critical factor" supporting the Routeholders' "status as contractors." Defs.' Mem. at 13 (citing *Silk*, 331 U.S. at 718). Again, Defendants gloss over critical disparities between the facts of this case and those in the precedent upon which they rely. In *Silk*, which involved the propriety of the IRS's assessment of employer-paid social security taxes against a trucking company, there was "no real dispute" that the company "'exert[ed] no control'" over the helpers used by its truckmen and, indeed, had "'no knowledge'" of the helpers' employment. *Silk*, 331 U.S. at 716 & n.11 (quoting *Greyvan Lines v. Harrison*, 156 F.2d 412, 415-16 (7th Cir. 1946)). The "'complete control of the truckmen as to how many, if any, and what helpers they make use of in their operations'" was found to be a "'vital'" factor in the determination that the truckmen were independent contractors. *Id.* at n.11 (quoting *Greyvan Lines*, 156 F.2d at 416.); *see also id.* at 719 (stating that it agreed with the reasoning of the *Greyvan* decision). In short, the two "vital" considerations supporting independent contractor status in *Silk*, neither of which is present here, were: (a) the truckmens' "complete freedom" with respect to the hiring of helpers, and (b) the employer's complete lack of control over the helpers' work.

This case is nothing like *Silk*. First, it is beyond dispute that Kinray could and did control Routeholders' engagement of Helpers. It not only required Routeholders to obtain its approval before using a Helper but also required each Helper to pass a background check it administered, issued Helpers with identification cards, and required them to sign confidentiality agreements. *See* COMF ¶ 82; RSAF ¶¶ 303-04, 311-12, 385. Routeholders were required to submit written requests

14

and obtain Kinray's permission before engaging a Helper to cover their route, RSAF ¶¶ 306, 309, and Kinray admits that it denied Routeholders' applications to use specific Helpers, and that it retains authority to "prohibit Helpers from working on a specific route," *id.* ¶¶ 307-08.  Kinray directed some Routeholders to obtain a Helper to drive their route, *id.* ¶ 301, and instructed others as to how much to pay their Helpers, *id.* ¶ 310.

Second, after a Helper was approved, Kinray controlled that Helper to the same extent it controlled the Routeholders.  Helpers were required to give Kinray their contact information, and Kinray maintained a list of Helpers that it would use to help Routeholders find a substitute Helper to cover their routes.  *Id.* ¶¶ 314, 318-19.  Kinray called Helpers directly to discuss route issues or to inform them that their route was ready to be loaded, and it required Helpers to notify Kinray if they experienced any problems on a route.  *Id.* ¶ 315-17.  Kinray often asked Helpers to complete the deliveries for a specific stop or route without involvement of Routeholders, and even paid some Helpers directly.  *Id.* ¶ 313, 320.  Furthermore, as discussed below, Kinray controlled the schedules of performing Helpers to the same extent as performing Routeholders, *infra* at 16-19, and Helpers were subject to the many extra-contractual rules promulgated by Kinray to the same extent as Routeholders, RSAF ¶ 322; *see infra* at 19-22.

In short, Plaintiffs have produced substantial evidence from which a jury could conclude that Kinray (a) retained ultimate authority over whether and the extent to which Routeholders could "share work" with Helpers, and (b) retained the same right to supervise Helpers driving its routes as it did to supervise Routeholders when they were driving the routes.  There are a multitude of post-*Silk* Circuit and District court cases, including from the Second Circuit, that have relied on similar showings to find workers not to be independent contractors as a matter of law, despite their ability to hire helpers.  *See Thomas*, 663 Fed. App'x at 90 (reversing summary judgment where it

15

was disputed whether the drivers could "share work with others without TXX's approval"); *Walling v. Twyeffort, Inc.*, 158 F.2d 944, 947-48 (2d Cir. 1947) (outside tailors were employees where they worked from home shops and employed others, including an apprentice, to assist with their contractual obligations); *see also Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1102-03 (9th Cir. 2014) (drivers who could hire helpers were employees under California's "right to control" test because they "did not have an unrestricted right to choose these persons, which is an important right that would normally inure to a self-employed contractor" (internal citations and alterations omitted)); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1317 (11 Cir. 2013) (worker's ability to hire helpers is "illusory" for purposes of the FLSA if the helpers are also subject to the control of the alleged employer); *Flores*, 2017 U.S. Dist. LEXIS 62124, at *48-50 (collecting cases in which courts rejected attempts to "manufacture" disputes about employee status "based on the fact that delivery drivers could hire helpers where it is undisputed that helpers must be approved by the alleged employer and are subject to all the same requirements as drivers"); *Artola v. MRC Express, Inc.*, No. 14-cv-23219, 2015 U.S. Dist. LEXIS 130183, at *17-18 (S.D. Fla. Sept. 25, 2015) (summary judgment unwarranted where parties disputed whether driver could hire helper "independent of [defendant's] involvement" and the extent to which helper was "managed" by the defendant while on the job).

> d. <u>Defendants exerted extra-contractual control over the schedules of performing Routeholders and Helpers</u>

One of the hallmarks of an independent contractor is control over one's own schedule—the freedom to set one's own "hours and days of work." *Saleem*, 854 F.3d at 148 (internal quotation marks omitted). By contrast, employee status will be found where "'the demands of the business controlled the workers' schedule.'" *Id.* (quoting *Dole*, 875 F.2d at 806) (brackets omitted). The latter was indisputably the case for the Routeholders and Helpers who performed

16

the deliveries for Kinray—their schedules were completely at the mercy of Kinray's business demands in at least three ways.

First, Kinray dictated the time at which routes would be ready to load, and the servicing Routeholders or Helpers had to conform to those times.  Although each ICA contained broad time frames, spanning 4 to 16 hours, during which Kinray represented that it would make the route's merchandise available for pickup, in reality Drivers did not have discretion to choose their own arrival time, even within those windows.  RSAF ¶¶ 235-36.  Instead, Kinray provided the servicing Routeholders and Helpers with specific loading times—if the Drivers were not at the facility within 15 to 30 minutes of those times, Kinray would send the route with another driver.  *Id.* ¶¶ 238-41, 317.  Yet if Kinray did not have a route ready to load at the specified time, it still required the servicing Routeholder or Helper to report to its facility at that time to wait until the route was ready.  *Id.* ¶¶ 246-48.  Kinray could and did regularly change the specific loading times.  *Id.* ¶ 243. If a route was ready to load early, for example, Kinray called the servicing Routeholder or Helper and directed them to pick it up immediately, even in the middle of the night, so that the company could clear its loading docks.  *Id.* ¶¶ 243-45.  This practice became particularly onerous after 2012, when Kinray implemented a rule that no Driver could leave the Kinray facility before approximately 6:00 a.m.  *Id.* ¶ 249.  This meant that Routeholders and Helpers called to Kinray as early as 2:00 a.m. to load their routes would have to wait at the facility for hours until allowed to leave.[9]  *Id.* ¶¶ 249-51.  Finally, Kinray also at times instructed Routeholders and Helpers to pick up merchandise outside of the time frames listed in the ICAs.  *Id.* ¶ 242.

Second, once the vehicles were loaded, the ICAs specified that morning deliveries were to

---

[9] Defendants do not truly deny these facts, they just claim they are incomplete because, in their telling, Drivers whose routes were ready in the early morning could do such activities as "sleep in their van" or "go get breakfast" while they waited for Kinray's permission to leave on their routes.  RSAF ¶¶ 249-51.  How this is any less of an imposition to a Driver forced out of bed at 2:00 or 3:00 a.m. Defendants do not endeavor to explain.

be completed by noon and that afternoon deliveries were to be finished no later than 6:00 p.m.  *See* Ekelman Aff., Exs. AG-AO ¶ 1(b).  Upon receiving the route manifest, moreover, the servicing Routeholder or Helper was required to make every delivery listed on the manifest and could not turn down or decline a stop.  RSAF ¶¶ 165-66, 183.  Kinray also prohibited Drivers from "deviat[ing] from the assigned route" or making any stops that did not relate to Kinray deliveries. *Id*. ¶ 180, 182.  Drivers were ordered to go directly to each delivery stop and were threatened with discipline if they stopped for food, coffee, or to talk with other drivers after their vehicles were loaded.  *Id*. ¶¶ 182, 206-07.  Kinray's security personnel even occasionally followed Drivers to check if they were making non work-related stops.  *Id*. ¶ 210.  As Defendants dispute many of these facts, there exists a triable issue of fact as to whether "drivers could take breaks on their delivery routes without facing disciplinary action."  *Thomas*, 663 Fed. App'x at 89.

Last, after all deliveries on a route had been completed, Kinray continued to control the schedules of the servicing Routeholders and Helpers by requiring them to return any undeliverable merchandise back to Kinray's warehouse the same day it was received and dictating the times when those returns could be made.  *Id*. ¶¶ 257, 260.  From Mondays to Thursdays, Kinray's warehouse closed at approximately 6:00 p.m. and reopened at approximately 10:30 p.m.  *Id*. ¶ 258. Thus, if a servicing Routeholder and Helper was unable to return undeliverable merchandise to Kinray before 6:00 p.m., Kinray required him or her to bring it back after the warehouse reopened. *Id*. ¶ 259.  On some occasions, Kinray required servicing Routeholders and Helpers to load merchandise for pharmacies that had already closed.  This meant they would have no choice but to return to the warehouse that evening and they would not be paid for the closed pharmacy stop. *Id*. ¶¶ 265-70.  The effect of this extensive control over Drivers' schedules meant that many of the

Bellwether Plaintiffs spent more than 80 hours per week servicing Kinray routes.[10]  *See id.* ¶ 256

Defendants argue that their imposition of time limits for pick up and delivery should be disregarded because they were "imposed as a result of Kinray's business."  Defs.' Mem. at 16 (citing *Browning*, 855 F. Supp. 2d at 602 ("While there were certain time limits imposed upon the Plaintiffs as to when they should pick-up or deliver packages, these constraints stemmed from the nature of the business . . . .  It is reasonable that a company such as CEVA would impose boundaries of this nature in the shipping business.")).  *Browning*'s conclusion—that a company's exertion of control is less dispositive when it results from that company's business needs is simply incorrect.  If that reasoning were followed to its logical conclusion, there would never be any employees at all.  There is no doubt, for example, that hourly hamburger cooks at McDonalds serve an essential business need.  *Saleem* confirms that *Browning* got it wrong by clarifying that workers are more *likely* to be employees where "the demands of the business controlled [their] schedule."  *Saleem*, 854 F.3d at 148 (internal quotation marks and brackets omitted).  Put another way, if the very nature of a business requires it to dictate its worker's schedules to the extent Kinray did here, "then that business must hire employees, not independent contractors."  *Scantland*, 721 F.3d at 1316 ("The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control.  Business needs cannot immunize employers from the FLSA's requirements.").

        e.  <u>Defendants exerted extra-contractual control over the manner and means by which Routeholders and Helpers performed their deliveries</u>

---

[10] Of course, to the extent the performing Routeholders and Helpers had any schedule flexibility at all, "flexibility in work schedules is common to many businesses and is not significant in and of itself."  *Snell*, 875 F.2d at 806; *see also Keller v. Miri Microsystems LLC*, 781 F.3d 799, 814 (6th Cir. 2015) ("[A] worker's ability to set his own hours and vacation schedule is not sufficient to negate control." (internal quotation marks omitted)); *Superior Care*, 840 F.2d at 1057, 1060 (where plaintiffs could decline proposed assignments for any reason, finding that control factor weighed in favor of employee status).

In addition to Kinray's extensive control over the schedules of the servicing Routeholders and Helpers who made its deliveries, Kinray also possessed and exercised authority to dictate the manner and means of how they performed those deliveries.  Kinray unilaterally issued numerous written rules and instructions to Drivers, which covered all aspects of their performance, including the care and maintenance of vehicles, prohibitions on making non-delivery stops while on their routes, requirements to wear Kinray IDs while making deliveries and to call Kinray for instructions if a pharmacy were closed at time of delivery, the completion of manifests, the handling of invoices and checks, and the manner of making returns to Kinray.  *See generally* Nussbaum Aff., Exs. 53, 54 (compilations of written rules and instructions issued by Kinray and their English translations if originally written in Spanish).[11]  Many of these instructions threatened Drivers with fines and discipline including termination if violated.  RSAF ¶¶ 341-42.  For example, Kinray instructed Drivers that they would be fined $250 if they lost an invoice or customer check, or if they gave a pharmacy the wrong invoice, *id*. ¶¶ 369, 381, and would forfeit their pay for a stop if the forms or checks received from the customers were "deposited in the wrong bin, lost or returned late," *id*. ¶ 372.  These threats of discipline are "strong evidence" of control.  *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 917-18 (S.D.N.Y. 2013) (employer's "written threat to impose . . . fines, and its imposition of such fines on non-compliant dancers, even if largely retracted, is strong evidence of its control over them"); *Thompson v. Linda and A. Inc*., 779 F. Supp. 2d 139, 148

---

[11] Kinray objection to Plaintiffs' reliance on written rules and instructions it issued before the limitations period of this case is wholly without merit.  *See, e.g.*, RSAF ¶ 399.  In response to interrogatories promulgated by Plaintiffs' Defendants admitted that they had never repudiated any of the written instructions identified by Plaintiffs in Exhibits 53 and 54 of the Nussbaum Affirmation.  *See* RSAF ¶ 344; Nussbaum Aff., Ex. 55 at 10-11 (Defendants' response to Interrogatory 1(c).).  To the extent Defendants suggest that their interrogatory responses are not "record evidence," they are mistaken.  *See* RSAF ¶¶ 346-49.  Defendants' interrogatory responses record evidence fully admissible at trial as admissions of a party opponent.  *See* Fed. R. Civ. P. 33(c) (stating that interrogatory answers "may be used to the extent allowed by the Federal Rules of Evidence"); *Miroglio S.P.A. v. Conway Stores, Inc.*, No. 05-cv-121 (BSJ) (GWG), 2007 U.S. Dist. LEXIS 8034, at *21-22 (S.D.N.Y. Feb. 6, 2007) ("[T]he interrogatory answers submitted by the [D]efendants constititue an admission of a party opponent" admissible under Rule 801(d)(2) of the Federal Rules of Evidence).

(D.D.C. 2011) (ability to punish dancers for violations of House Rules through fines indicative of control even when violations did not result in fines or fines were uncollected).

Kinray also gave several Bellwethers specific instructions regarding their vehicles. It instructed Routeholder Luis Velazquez and Helper Adriana Renteria to purchase "backup" or "emergency" vehicles in case their main delivery vehicle became unavailable, and to remove the seats from their vehicles to fit more deliveries. *Id.* ¶¶ 397-98, 400. Kinray employees directed Routeholder Henry Narvaez to have tinted windows on his vehicle, *id.* ¶ 401, and threatened Routeholder Freddy Fernandez with the removal of his routes if he did not acquire a larger vehicle. *Id.* ¶ 396. Conflicts about similar evidence precluded summary judgment in *Thomas*. 663 Fed. App'x at 90 (noting that plaintiffs' "declarations asserting that TXX required them to use vans over a particular size and under a particular weight and to ensure that the vans had tinted windows" created a dispute of material fact).

Unlike other cases, no provision in the ICAs permitted Kinray to issue such extra-contractual rules and policies. *Compare* Ekelman Aff., Exs. AG-AO, CC, *with Silk*, 331 U.S. at 708-09 (contracts required truckmen "to follow all rules, regulations, and instructions of the company"); *Saleem*, 854 F.3d at 136 ("The franchise agreements also required that drivers comply with 'Rulebooks' – manuals setting out certain standards of conduct."). Thus, Defendants do not even have the fig leaf of a contract to hide behind to argue that these rules were part of some bargained-for exchange. They were pure, unilateral exertions of control by Kinray over servicing Routeholders and Helpers.[12] This conclusion is bolstered by Kinray's admission that it did not

---

[12] Although they have mentioned at various points in this litigation that some rules were imposed on Drivers because Drivers were transporting pharmaceuticals, Defendants have failed to make any such argument in their memorandum of law. In any event, it does not matter to the economic reality analysis why the rules were imposed. *Scantland*, 721 F.3d at 1316 ("The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control.")

impose any of 92 written rules or instructions identified by Plaintiffs on courier services such as FedEx and UPS, which Defendants also engaged to make deliveries. *Id.* ¶¶ 36, 348; *see also* Nussbaum Aff., Ex. 55 at 12 (Defendants' responses to Interrogatory 2(a)-(b)).

f.  <u>Defendants, not Routeholders or Helpers, controlled the relationship with customers</u>

Finally, Defendants controlled all aspects of the business relationship with their pharmacy customers. Defendants, not Drivers, entered into contracts with pharmacies for the delivery of merchandise. RSAF ¶ 5. Drivers did not have a business or professional relationship with any pharmacies and, indeed, Kinray prohibited such relationships. RSAF ¶¶ 418-19. Defendants admit that Drivers had no authority to negotiate with customers about prices, schedule changes, terms of payment, or any other aspect of the business relationship. *Id.* at ¶ 421. They also do not dispute that Drivers were prohibited from making their own arrangements with pharmacies about delivery times, *id.* at ¶ 185, and that any such arrangements had to be made through Kinray, *id.* at ¶ 186. Such prohibitions on individual's ability to independently interact with and accept additional work from customers has been found to be indicative of employee status. *See, e.g.*, *Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 455 (S.D.N.Y. 2002) (finding disputed issue of fact as to control factor where parties disputed, *inter alia*, whether "carpet mechanics were . . . permitted to accept jobs from the customers aside from the work they were assigned to complete for ABC").

**2. Opportunity for Profit or Loss & Investment**

Defendants' control over all aspects of the business relationship with the pharmacies bleeds directly into Plaintiffs' opportunity to profit from the delivery business and also mitigates their risk of loss. Defendants controlled how many pharmacy stops were included on a given route, thus limiting Drivers' ability to earn more income by making more deliveries. Moreover, as

22

Defendants' shipping manager admitted, Drivers were prohibited from earning extra income by making "side deals" with pharmacies to deliver products to them earlier in the day in exchange for additional payments. Ekelman Decl., Ex. E (Shemanski Dep. at 100:22-101:12). This inability to earn independent income directly from Defendants' customers cuts decidedly in favor of employee status. *Compare Arena v. Plandrome Taxi, Inc.*, No. 12-cv-1078 (DRH), 2014 U.S. Dist. LEXIS 51967, at *15 (E.D.N.Y. Apr. 14, 2014) (profit or loss factor weighed in favor of employee status where taxi drivers were not "permitted to determine the amounts of fares to charge customers"), *with Saleem*, 854 F.3d at 137 (independent contractor status found where black car drivers made "individual arrangements" with customers).

In addition, because the payment terms of the ICAs were conditioned only on a base rate and a per-stop delivery rate, and not on the receipt of payments from pharmacies, Drivers were effectively insulated from any risks associated with customer non-payment, which is also highly indicative of employee status. *See, e.g.*, *Gayle v. Harry's Nurses Registry, Inc.*, 594 Fed App'x 714, 717 (2d Cir. Dec. 8, 2014) (profit or loss factor "weighs heavily" in favor of employee status where nurses were "paid promptly regardless of whether the insurance carrier pays [the employer] promptly"). Defendants also insulated Drivers from other risks of loss. Kinray extended interest free loans to a number of the Bellwether Plaintiffs to purchase vehicles or to cover other expenses. RSAF ¶¶ 412-15. It also paid for Drivers' parking violations. *Id.* ¶ 417. This financial assistance, coupled with the fact that Drivers were insulated from any deleterious effects of customer non-payment, conclusively demonstrates that, unlike true independent contractors, Drivers "did not have the opportunity to make an ill-advised, independent business decision that would result in a significant loss of profit." *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001).

While some of the Bellwether Plaintiffs had companies, Plaintiffs have submitted evidence

that they only did so at Kinray's behest, and that Kinray provided financial assistance to form corporations. *See Gustafson*, 171 F. Supp. 2d at 325 (finding employee status where it was "undisputed that plaintiff technically was in business, having incorporated [a company] . . . [but] did so at the Company's behest, for he would not otherwise have been able to drive for the Company."). Moreover, Defendants do not dispute that Drivers who formed corporations continued to provide delivery services exclusively for Kinray, did not have websites for their corporations, and did not advertise those corporations to the general public. RSAF ¶¶ 296, 297, 299. Further, Defendants have not identified evidence that Drivers were able to reduce any of their costs through efficiency. *Molina v. S. Fla. Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1286 (M.D. Fla. 2006) ("While theoretically possible, there is little to no evidence demonstrating that the Plaintiffs actually were able to (or in fact did) reduce their costs through any means.").

With respect to Drivers' investment, "the 'investment,' which must be considered as a factor [in the economic reality test] is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Snell*, 875 F.2d at 810; *see also Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1224 (D. Kan. 2008) ("The comparison of a worker's individual investment to the employer's investment in the overall operation helps to distinguish between employees and independent contractors."). Furthermore, it is appropriate to consider the relative investments of the parties in deciding whether this factor weighs in favor of finding the worker to be an employee. *Snell*, 875 F.2d at 810-811. Here, as Defendants note, some Bellwethers spent between $24,000 and $30,000 purchasing vehicles, which they used for both work and personal purposes, and paid for related expenses. Defs.' Mot. at 21. This investment pales in comparison to Defendants' extensive investments in their Whitestone facility, warehouse, and their hundreds of employees and managers all of which, if Kinray's sale price is any indication,

should be valued at $1.3 Billion.  In reviewing a summary judgment decision with similar facts, the Sixth Circuit concluded that "the trier of fact should decide how [the plaintiff's] capital investments compared to [the defendant's], and whether [the plaintiff's] capital investments demonstrate that [he] was economically independent."  *Keller*, 781 F.3d at 811.

Moreover, it is undisputed that Drivers could and did use their delivery vehicles for personal purposes, RSAF ¶ 416, thus "diluting" the extent of their investment in their provision of services to Kinray.  *Keller*, 781 F.3d at 810 ("[T]here are inherently some capital investments that do not necessarily evidence economic independence.  For example, investment of a vehicle is no small matter, but that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes." (internal quotation marks and alterations omitted)); *see also Lewis*, 554 F. Supp. 2d at 1224 ("In the context of delivery services, courts have rejected the notion that an individual's use of his personal vehicle renders him an independent contractor.").

### 3.  Degree of Skill & Independent Initiative

Plaintiffs have testified that Defendants did not require them to have any prior experience or a commercial driver's licenses to work for the Company. RSAF ¶ 28, 51-56. As Defendants' did not require Drivers to have anything other than a regular driver's license, there can be no question that the act of being a delivery driver for Kinray does not require special skill.  *See, e.g., Gustafson,* 171 F. Supp. 2d at 326 ("[P]laintiff's duties as a chauffeur required no specialized skill or initiative, suggesting that plaintiff was an employee rather than an independent contractor.").[13]

Moreover, as discussed in detail *supra* at 6-16, Defendants' claims that Plaintiffs engaged

---

[13] *See also, e.g., Campos*, 2011 U.S. Dist. LEXIS 78905 at *20 (finding "no evidence that [the plaintiff's] job as a delivery person required him to possess any particular degree of skill," and that the plaintiff "did not need education or experience to perform his job"); *Sakacsi v. Quicksilver Delivery Sys.*, 2007 U.S. Dist. LEXIS 88747 at *23 (M.D. Fla. Nov. 28, 2007) ("There is little to be said about the skill and initiative required in order for the drivers to perform their jobs. The evidence before the Court is ripe with testimony characterizing the delivery job as simple, straight-forward, and requiring little skill aside from the ability to drive a car from point A to point B.").

in a "broad range of business models" is patently absurd.  Plaintiffs have adduced significant evidence that they worked almost exclusively for Kinray for many years and could not negotiate their rates of pay or schedules.  *See, e.g., Lewis*, 554 F. Supp. 2d at 1225 ("The record contains evidence that plaintiff could not negotiate pay based on his level of experience, which suggests employee status.").  Furthermore, Defendants' reliance on Plaintiffs' tax filings is contrived as it was Defendants' unilateral decision as to how to pay and characterize Drivers for tax purposes.  RSAF ¶ 286.  As one court has recently recognized in discussing the limited relevance of a worker's tax classification to the independent contractor analysis: "It would be a bold worker indeed who, notwithstanding the fact that she is paid as an independent contractor, nevertheless files her taxes as an employee, thereby exposing her employer to potential tax penalties." *Agerbrink v. Model Serv. LLC*, 2017 U.S. Dist. LEXIS 33249, at *18-19 (S.D.N.Y. Mar. 8, 2017). Indeed, the absurdity of Defendants' position is illustrated by the fact that they could and did provide a Driver who performed the same duties as Plaintiffs with employee benefits when it suited them.  RSAF ¶¶ 289-291.  Accordingly, Defendants cannot establish that Drivers had any particular skill or exercised real initiative in performing their job.

### 4.  Permanence and Duration of the Working Relationship

"Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Keller*, 781 F.3d at 807 (citations and quotations omitted).  Here, Plaintiffs testified that they worked full-time, almost always exclusively, and for substantial periods of time – in many cases more than twenty years. (cite).  Therefore, this factor weighs strongly in favor of employee status.  *Scantland*, 721 F.3d at

1318 ("Plaintiff worked for Knight for an average of more than five years. Their contracts were for year terms, were automatically renewed, and were terminable only with thirty days' notice. These facts suggest substantial permanence of relationship.").

### 5.   Routeholders and Helpers were an Integral Part of Kinray's Business

Finally, Kinray is a pharmaceutical distributor whose business model is premised on daily deliveries to pharmacies.   RSAF ¶ 5.   During the limitations period, over 90% of Kinray's deliveries were made by Plaintiffs or similarly situated individuals, and not by other entities.   *Id*. ¶¶ 35, 36.   Accordingly, since Kinray is "in the delivery business . . . , [w]ithout drivers such as Plaintiff[s], [it] would have been unable to perform its delivery business." *Ferreira v. Network Express, Inc.*, 2007 U.S. Dist. LEXIS 103035, at 11 (M.D. Fla. Mar. 9, 2007) (citing *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp 2d 184, 191-92 (S.D.N.Y. 2003) ("defendants concede that they are engaged primarily in the business of providing delivery services […] and that plaintiffs perform the actual delivery work. Thus, plaintiffs' services constitute an integral part of the […] defendants' business.)).   Moreover, when an individual's work is integral to business, that supports a finding that she is an employee, regardless of whether she is easily replaceable.  *See*, *e.g.*, *Dixon v. Zabka*, No. 11-cv-982, 2014 U.S. Dist. LEXIS 159692, at *73-74 (D. Conn. Nov. 13, 2014) (finding that this factor weighed in favor of employee status even where defendants argued that the workers' work was "interchangeable and easily replaceable"). Because Drivers' work is integral to Defendants' business, this factor weighs heavily in favor of finding Plaintiffs to be Defendants' employees.

### B.  A Reasonable Jury Could Find that the Bellwether Plaintiffs were Employees Under New York Law.

Under New York law, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the

results produced or the means used to achieve the results." *Bynog v. Cipriani Grp. Inc.*, 1 N.Y.3d 193, 198 (N.Y. 2003).  As many courts in this Circuit have recognized, however, "[t]here is general support for giving FLSA and the New York Labor Law consistent interpretations," and, "there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Hart*, 967 F. Supp. 2d at 923 (collecting cases).  Accordingly, based on the same facts and analysis, discussed above, summary judgment is also inappropriate under the NYLL.

### C. Defendants Have Failed to Submit Evidence Demonstrating that they Complied with the Clear Regulatory Prerequisites to Claiming the FLSA's "Local Driver" Exemption to the FLSA's Overtime Requirement.

Defendants' argument that Plaintiffs are exempt "local drivers" under 29 U.S.C. § 213(b)(11) is frivolous. That statutory provision and its implementing regulations explicitly require a finding by the Secretary of Labor before the exemption applies. *See* 29 U.S.C. § 213 (b)(11) (stating that certain driver employees may be exempt from the FLSA "*if the Secretary shall find*" that certain requirements exist (emphasis added)); 29 C.F.R. § 551 ("[A]n employee employed and compensated as described in the quoted paragraph (11) may be employed without payment of overtime compensation for a workweek longer than the maximum workweek applicable to him under section 7(a) of the Act, *but only if it is established by a finding of the Secretary* that the employee is compensated [...] on the basis of trip rates or other delivery payment plan that has the general purpose and effect stated in section 13(b)(11). Such a finding is prescribed by the statute as one of the '*explicit prerequisites* to exemption'") (citing *Arnold v. Kanowsky*, 361 U.S. 388, 392 (1960) (emphasis added)). Defendants do not even pretend that any such finding exists here.  As a result, Plaintiffs are not exempt "local drivers."[16]

---

[16] Defendants' contention is essentially that they *could* have been entitled to the exemption had they bothered to follow the statutory and regulatory prerequisites. This, too, is insincere.  Plaintiffs testified that they worked 80-90 hours per

**D. Defendants' Motion for Summary Judgment with Respect to Liquidated Damages and the FLSA Statute of Limitations is not Properly Before the Court and Should be Denied**

Defendants' assertions that their actions were in good faith and not willful contravene the Parties' Stipulation regarding the Bellwether process and are thus not properly before the Court at this time. In the Stipulation, the Parties agreed that the summary judgment would be limited to a decision that fully disposes the misclassification issue. COMF ¶ 7; Dkt. No. 285 ¶ 5. Given this understanding, the Parties limited discovery to the employee/independent contractor issue and did not fully explore what steps Defendants may have taken to ensure that they complied with the law. To the extent this point was unclear, Defendants clarified their position by refusing to produce information related to their alleged good faith/lack of willfulness because, in Defendants' words, they were "irrelevant" at this time. Specifically, in a discovery deficiency letter to Defendants, Plaintiffs sought communications between Defendants and their attorneys related to the misclassification of Drivers as well as communications related to tax audits that Defendants now use to support their claim they acted in good faith. Nussbaum Second Aff. at ¶ 3 & Ex. A.  In response, Defendants flatly asserted that such information would "not be produced" because it was "irrelevant to any claim or defense in this matter." *Id.* ¶ 4 & Ex. B. Defendants simply cannot refuse to produce discovery on this point because it was premature and then move for summary judgment on that very point.  In view of the fact that discovery on these issues has not been completed, Plaintiffs submit that they are not properly before the Court and summary judgment with respect to them should be denied.[17]

---

week, based on schedules that Kinray controlled, and under which Drivers were not permitted to deviate from Kinray's order of delivery which was not necessarily the most efficient sequence of delivery. *See* RSAF ¶ 11. Thus, Defendants cannot show they paid Drivers per stop rates which constituted a "plan" whereby Drivers' hours could be reduced to below the "maximum workweek, *i.e.*, forty hours." Defs.' Mem. at 26.

[17] Summary judgment should also be denied because Defendants have not met their burden, as the moving party, of establishing that there are no issues of material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Defendants support their position here by pointing to (1) the unclear testimony of Kinray's former owner

29

### E.  A Reasonable Jury Could Find that Defendants Retaliated against Plaintiff Fernandez.

Defendants, in their half-hearted attempt to kick out Plaintiff Fernandez's retaliation claims, do not even bother to point to any evidence on the record that contravenes Mr. Fernandez's claims.  To establish a *prima facie* claim of retaliation under the FLSA (and the NYLL), a plaintiff must show, *inter alia*, a causal connection between protected activity and the retaliatory action. *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). After that, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).  Defendants state that Mr. Fernandez's contracts were terminated not in retaliation for bringing this case, but rather as part of a wave of layoffs at Kinray in September 2013 and September 2015.  Defs.' Mem. at 30.  But the contract termination about which Mr. Fernandez complains did not occur during either of those mass layoffs.  Rather, in the Amended Complaint and his deposition testimony, Mr. Fernandez claims Defendants cancelled WJ route routes in *October 2013*, two weeks after this lawsuit was filed.  *See* Dkt. Nos. 191, at Ex. C ¶ 317; Ekelman Aff., Ex. K (F.Fernandez Dep.) at 21:15-22:21, 93:9-11. Accordingly, Defendants have failed to "articulate a legitimate, nondiscriminatory reason for the termination." *Gorzynski*, 596 F.3d at 110.

### IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

---

about an opinion he allegedly received over 40 years ago; (2) letters from the New York State Department of Taxation that include no reference to Plaintiffs or their classification; (3) an inscrutable and incomplete document; and (4) a New York state Court decision rendered *after* this case was already filed.  *See* Defs.' Mem. at 27-30.  This evidence does nothing to meet Defendants' burden of proving there are no issues of fact as to whether they acted in good faith. *See, e.g., Velasquez v. Dig. Page*, Inc., No. 11-cv-3892, 2014 U.S. Dist. LEXIS 160999, at *6 (E.D.N.Y. Nov. 17, 2014) (denying summary judgment on lack of willfulness/good faith where Defendants' evidence was insufficient).

Nevertheless, to the extent the Court believes these issues should be included in the Bellwether process, Plaintiffs respectfully request that, pursuant to Fed. R. Civ. P. 56(e)(1), they be afforded the opportunity to take discovery and submit additional evidence regarding these issues.

Dated: New York, New York
       July 21, 2017

By:     _Lucas C. Buzzard_____
          D. Maimon Kirschenbaum
          Josef Nussbaum
          Lucas C. Buzzard
          JOSEPH & KIRSCHENBAUM LLP
          32 Broadway, Suite 601
          New York, NY 10004
          212-688-5640

          *Attorneys for Plaintiffs*