UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
FREDDY FERNANDEZ, ESMERALDA
AMAYA, RAFAEL CASASOLA, ARTURO
COELLO, FRANKY DORADO, PAULA
DORADO, RUBEN ESPINOZA, JULIO
GOMEZ, GIOVANNY GONZALEZ, NEIL
GUZMAN, HENRY NARVAEZ, LUIS
FERNANDO NAVARRETE, MARIA
ROMERO, FREDDY VASQUEZ, and
LUIS VELASQUEZ, on behalf of themselves
and all others similarly situated,

**MEMORANDUM OF
DECISION AND ORDER**

13-CV-04938 (LDH) (SMG)

Plaintiffs,

-against-

KINRAY, INC., and CARDINAL HEALTH,
INC.,

Defendants.
------------------------------------------------------------------x

LaSHANN DeARCY HALL, United States District Judge:

Plaintiffs,[1] on behalf of themselves and the collective class, bring this action against Defendants Kinray, Inc. and Cardinal Health. Inc. (collectively referred to as "Kinray" or "Defendants"),[2] asserting claims for unpaid overtime under the Fair Labor Standards Act (the "FLSA" or the "Act") and New York Labor Law ("NYLL"), notice violations under the NYLL, and unlawful deductions and untimely payment of wages under the NYLL. Plaintiffs' claims arise out of Defendants' alleged misclassification of Plaintiffs as independent contractors rather than employees. In addition, Plaintiff Freddy Fernandez brings retaliation claims under the

---

[1] There are approximately 112 Plaintiffs in this action. By stipulation, the parties streamlined discovery and dispositive motion practice to 19 Bellwether Plaintiffs. (Stipulation, ¶ 1, ECF No. 285; December 16, 2015 Order.)
[2] Cardinal Health, Inc. acquired Kinray as a subsidiary. (Pls.' Reply 56.1, ¶ 15, ECF No. 338-1.)

1

FLSA and NYLL, arising out of Defendants' cancellation of his delivery services contracts. Defendants move pursuant to Federal Rule of Civil Procedure 56 for summary judgment.

## BACKGROUND

Kinray is a wholesale pharmaceutical distributor. (Pls.' Reply 56.1, ¶ 10, ECF No. 338-1.) After Kinray purchases pharmaceuticals from manufacturers, it resells and delivers the products to pharmacy retailers. (*Id.* ¶ 12.) Throughout the relevant time period, Kinray delivered its products to its customers using large couriers, such as UPS and FedEx, or using workers engaged under Independent Contractor Agreements ("IC Agreements"). (*Id.* ¶ 16.)

Approximately half of the Bellwether Plaintiffs were individuals who or proprietors of corporations that entered into IC Agreements with Kinray to provide pick-up, delivery, and return services for Kinray ("Routeholders"). (*Id.* ¶¶ 8, 37, 40.) The remaining Bellwether Plaintiffs, "Helpers," were not parties to the IC Agreements but instead were engaged by Routeholders to perform services under the IC Agreements on the Routeholder's behalf. (*Id.* ¶ 8.) The IC Agreements were for terms ranging from two to eleven years. (Defs.' Reply 56.1 ¶¶ 140-41, ECF No. 354.) The IC Agreements included the following provision:

> This Agreement is not intended, and shall not be construed, as creating an employer-employee relationship; and the relationship of Contractor to KINRAY is that of an independent contractor. The mode, manner, method and means used by Contractor to achieve the delivery results as set forth in this Agreement are within the sole selection, direction and control of Contractor. This Agreement shall not preclude Contractor from performing delivery services for others, including but not limited to competitors of KINRAY.

(Ekelman Aff., Ex. AG ¶ 4, ECF No. 327-34.) Plaintiffs do not dispute the terms of the IC Agreements. (Pls.' Reply 56.1, ¶ 39.) Instead, Plaintiffs contend that Defendants exerted extra-contractual control over the drivers, thus rendering Routeholders and Helpers subject to the protections of the FLSA. (Pls.' Mot. at 6-22, ECF No. 359.)

2

Plaintiff Fernandez also brings a retaliation claim, alleging that Defendants cancelled his IC Agreements because he filed the instant action. (Am Compl. ¶¶ 312-320, ECF No. 191-3; Pls.' Mot. at 30.) It is undisputed that Defendants cancelled a "substantial" number of IC Agreements in September 2013 and September 2015. (Pls.' Reply 56.1 ¶¶ 17-18.) Plaintiff Fernandez testified that his IC Agreements were cancelled in October 2013. (Ekelman Aff., Ex. K at 21:15-22, ECF No. 327-12.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movants bear the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movants' claim. *Celotex Corp.*, 477 U.S. at 325.

Once the movants meets their initial burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movants and draw all justifiable inferences in their favor, *Anderson*, 477 U.S. at 255, but the non-movants must still do more than merely assert conclusions that are unsupported by arguments or facts. *Castro v. Cty. of Nassau*,

739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010) (citing *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996)). That is, the non-movants cannot survive summary judgment merely by relying on the same conclusory allegations set forth in their complaint. *See Murphy v. Lajaunie*, No. 13-CV-6503, 2016 WL 1192689, at *2 (S.D.N.Y. Mar. 22, 2016) (citing *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

## DISCUSSION

**I.     Classification of Plaintiffs' Employment under the FLSA and NYLL**

Defendants maintain that Plaintiffs' FLSA claims must be dismissed a matter of law, because Plaintiffs were not their employees, and, therefore, Defendants are not subject to the requirements of the Act. (*See generally* Defs.' Mot. at 1-26, ECF No. 357.) In opposition, Plaintiffs contend that the record raises triable issues of fact as to Plaintiffs' employment status precluding summary judgment. (*See generally* Pls.' Mot. at 1-28.) The Court agrees.

The FLSA is a remedial statute designed to "prevent abuses by unscrupulous employers, and remedy the disparate bargaining power between employers and employees." *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 207 (2d Cir. 2015). To that end, the FLSA establishes minimum wage, overtime pay, recordkeeping, and other employment standards as well as creates a private right of action against employers who violate its terms. *See* 29 U.S.C. § 216(b). The statute defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Significantly, courts are required to construe the FLSA liberally, including its definition of "employer." *See Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). Indeed, the Second Circuit has long recognized that FLSA was "written in the broadest possible terms" that "would have the widest possible impact in the national economy." *Id.* Accordingly, it has consistently declined to

4

impose limitations on the definition of employer that would "run[] counter to the breadth of the statute." *Id.*[3]

In assessing whether an individual or entity should be deemed an employer under the FLSA, the Second Circuit has adopted what is known as the "economic reality test." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). This test does not adhere to rigid formulations or labels to determine the existence of an employer/employee relationship. *Id.* at 143. Rather, the inquiry focuses on the relationship between the purported employer and employee, asking how much authority the "employer" exercised over the "employees." *Id.* This test has been articulated to include the following factors under circumstances such as here: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."[4] *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 139 n.19 (2d Cir. 2017) (citing *U.S. v. Silk*, 331 U.S. 704 (1947)). Significantly, although each of these factors may prove helpful in assessing a worker's employment classification, no single factor of the test is dispositive. Instead, any determination regarding an alleged employment relationship must be based on the totality of the circumstances.

---

[3] The definition of employer and analysis for determining whether an employer/employee relationship exists under the NYLL are parallel to that of the FLSA. *See* N.Y. Lab. Law § 190(3) ("'Employer' includes any person . . . employing any individual."); *Hernandez v. La Cazuela de Mari Rest., Inc.*, 538 F. Supp. 2d 528, 534-35 (E.D.N.Y. 2007) ("Like the definition for 'employer' under the FLSA, the definition under New York minimum wage law is expansive, and the question of whether an individual is an 'employer' under New York law involves the same legal considerations as those under federal law."); *Franco v. Jubilee First Ave. Corp.*, No. 14-CV-07729, 2016 WL 4487788, at *5 (S.D.N.Y. Aug. 25, 2016) (noting that courts in the Second Circuit apply the economic reality test to determine employer status under both the FLSA and NYLL) (collecting cases).

[4] Although there are different iterations of the economic reality test, the parties agree that these factors are relevant here. (Defs.' Mot. at 9; Pls.' Mot. at 5.)

5

*See Barfield*, 537 F.3d at 141 ("[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity.") (internal citations omitted). Defendants maintain that all of the material facts necessary for the Court to properly employ the economic reality test and reach a finding in favor of Defendants are undisputed. The Court disagrees.

In assessing the degree of control in the context of transportation workers similar to Plaintiffs here, courts in this circuit have found the following considerations useful: whether the drivers' had the ability to set their own schedules, whether the drivers had the ability to work for other companies, the degree to which the transportation company monitored and disciplined the drivers, and whether the company inspected the drivers' vehicles. *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 537-39 (S.D.N.Y. 2014), *aff'd sub nom. Saleem*, 854 F.3d 131. Virtually all of the facts relevant to these considerations are in dispute in this case.

For example, the parties dispute the extent to which Plaintiffs controlled their schedules. Plaintiffs maintain that they had little, if any, control because, as they testified, they were summoned by Kinray to load their merchandise at "specified times." (Defs.' Reply 56.1 ¶¶ 237-38.) Defendants dispute lack of control in this regard arguing simply that Plaintiffs "generally knew" when the merchandise was ready to load, and that if a driver did not arrive at that time, then Defendants would typically wait as long as 35 minutes for the driver to arrive.[5] (*Id.* ¶¶ 237-38, 240, 247.)

---

[5] Specifically, Plaintiffs contend that, despite the inclusion of a general timeframe in the route-specific IC Agreements dictating when Plaintiffs could arrive at Kinray to load merchandise, Kinray summoned Plaintiffs with "a specific time that Drivers were expected to arrive at the warehouse to load their vehicles." (Defs.' Reply 56.1 ¶¶ 233-35, 238.) If they failed to arrive within 15 to 30 minutes of the specified time, then their route for the day would be given assigned to another driver, resulting in a loss of pay for the Routeholder. (*Id.* ¶¶ 239-41.) However, Defendants contend that they would actually wait fifteen minutes for a driver, call the driver again, and then wait an additional twenty minutes before reassigning the delivery to another driver. (*Id.* ¶¶ 238, 240.)

It is likewise disputed whether Defendants disciplined or monitored drivers. Defendants maintain that they did not. (*Id.* ¶¶ 191, 210.) Plaintiffs argue, however, that when drivers failed to arrive on time for their designated route, the route would be given that day to an "extra driver,"[6] resulting in a loss of pay to the Routeholder. (*Id.* ¶¶ 239-41.) Moreover, Plaintiffs testified that they were issued manifests that mandated the order and number of stops that Plaintiffs were required to make along the delivery route. (Defs.' Reply 56.1 ¶¶ 174, 176.) According to Plaintiffs, under threat of discipline, Plaintiffs were prohibited from the following: making any changes to the delivery route absent Defendants' permission, declining a stop or contacting a pharmacy to arrange a specific delivery time, and making any stops unrelated to deliveries for Defendants, such as for food, coffee, or to talk to other drivers. (*Id.* ¶¶ 183, 185, 191, 208.)

With respect to Plaintiffs' ability to work for other companies, the parties agree that under the terms of the contract, Routeholders retained such a right. (Pls.' Reply 56.1 ¶ 43.) However, Plaintiffs contend, and Defendants dispute, that in practice Kinray prohibited drivers form carrying merchandise from other companies while drivers had Kinray merchandise in their vehicles. (*Id.*) The parties also dispute whether Kinray required Plaintiffs to purchase vehicles meeting specifications, (Defs.' Reply 56.1 ¶ 396), whether Plaintiffs were required to purchase "backup" vehicles (*Id.* ¶ 397), and whether Kinray required Plaintiffs to equip their vehicles with alarms, window tinting, and to remove passenger seats to create additional cargo room. (*Id.* ¶¶ 399-401.) In view of these disputed facts, among others, there remains a triable concerning the degree of control Kinray exercised over Plaintiffs.

Other factors relevant to the economic reality test are not in dispute and militate against

---

[6] An extra driver is an individual who signed IC Agreements but was not assigned specific routes. (Defs.' Reply 56.1 ¶ 16.)

finding Plaintiffs were employees of Kinray. For instance, it is undisputed that Routeholders made significant investments in their "business." *Saleem*, 854 F.3d at 144 ("[T]he record also shows that Plaintiffs invested heavily in their driving businesses—another indication that they were 'in business for themselves.'") (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)). Some spent tens of thousands of dollars to purchase vehicles. (Pls.' Reply 56.1 ¶ 71 (citing to deposition testimony indicating that Routeholder Gamarra spent over $25,000, Routeholder Villarejo spent over $13,000, Routeholder Bautista spent over $24,000, and Routeholder Velasquez spent over $30,000).); *see Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012) ("Of importance, the [p]laintiffs made substantial investments in their businesses. They utilized their own vehicles and all of their own tools and supplies, which of course supports a finding of independent contractor status."). In addition, Routeholders were responsible for costs of vehicle repair and maintenance, insurance, gasoline, parking, tolls, and cellular phones. (Pls.' Reply 56.1 ¶¶ 126, 128, 135, 142, 160, 166, 169, 180, 190.) *See Saleem*, 854 F.3d at 144-46 (determining that the drivers' expenditures for vehicle purchases, vehicle repairs and maintenance, licenses, registrations, insurance fees, tolls, parking, and tickets were indicative of independent contractor status). These costs were not insignificant. By way of example, Routeholder Melfer documented the following business expenses on his 2011 tax return: $6,720 for vehicle repair and maintenance; $1,380 for cellular phone; $4,550 for insurance; $5,150 for parking fees and tolls, and $20,450 for gasoline. (*Id.* ¶ 128.) Helpers were also responsible for such costs if so directed by their respective Routeholder. (*Id.* ¶¶ 104, 123, 178.)

Furthermore, Plaintiffs had opportunity for both profit and loss. *See Browning*, 885 F. Supp. 2d at 608 ("[W]hether the [p]laintiffs made more money or less money depended largely

on their investment … and hiring [of] additional employees in order to increase their efficiency and capacity. Thus, when viewed through the prism of the economic realities test, these facts weigh in favor of a finding of independent contractor status."). It is undisputed that several Routeholders held numerous IC Agreements thereby resulting in multiple streams of income potentially increasing profit. (Pls.' Reply 56.1 ¶¶ 100, 145, 167.) Moreover, Routeholders were able to hire Helpers to service their Agreements—some Routeholders paid Helpers less than the amount Defendants paid under the IC Agreement, which resulted in additional revenue for the Routeholder. (*Id.* ¶¶ 102, 122.) Routeholders also had the discretion to demand that Helpers supply their own vehicle and pay their own expenses, furthering Routeholder's margin for profit. (*Id.* ¶¶ 104, 123, 178.)

Likewise, there is no genuine dispute that Plaintiffs' services were not integral to Defendants' business. It is undisputed that Defendants' core business function is purchasing pharmaceuticals and reselling the products to its pharmacies. (*Id.* ¶¶ 10, 12.) Indeed, the parties agree that the delivery of the pharmaceuticals was merely "an operating expense" born by Defendants. (*Id.* ¶ 14.) Even if Plaintiffs were integral to the Defendants' business, the services performed by Plaintiffs could be readily performed by others, weighing in favor of an independent contractor classification. (*Id.* ¶¶ 16-18.); *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) (finding that, although the plaintiff's work was an integral part of the defendant's business model, plaintiff's work was interchangeable, therefore weighing in favor of independent contractor status.).

There are, however, other factors that weigh in Plaintiffs' favor. For example, serving as a Routeholder or Helper did not require specialized skill. *See Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 326 (S.D.N.Y. 2001) (finding that the plaintiff's duties as a chauffeur required

9

no specialized skill or initiative, thus supporting an employee classification). The IC Agreements stated that Plaintiffs were to be "fully trained in the operation of all equipment and in the use of all equipment … deem[ed] necessary to perform … obligations pursuant to [the IC Agreement]." (Defs.' Reply ¶ 52.) However, the record demonstrates that, as a practical matter, nothing other than a driver's license was required, nor have Defendants identified any other necessary training or equipment. (Defs.' Reply 56.1 ¶ 54 (admitting no commercial license was required for drivers).) Additionally, relationships between Plaintiffs and Kinray were typically of an extended duration as the IC Agreements were for terms ranging from two to eleven years. (*Id.* ¶¶ 140-41.) It is of little consequence that the IC Agreements include a mutual 30-day termination provision. There is no evidence in the record that this right was regular or if ever used by Plaintiffs. The inquiry in this regard is not what Plaintiffs could have done, but in fact what they actually did. *Saleem*, 854 F.3d at 142 ("[I]t is not what [p]laintiffs *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.").

Even in view of these facts, the Court is unable to make a determination on the working relationship between Plaintiffs and Defendants. Too many facts related to the issue of control are disputed. Absent the resolution of these facts, the court cannot properly assess the "totality of the circumstances" and any decision on a motion for summary judgment would be error. *See Thomas v. TXX Servs., Inc.*, 663 F. App'x 86, 89 (2d Cir. 2016) (holding that the district court erred in granting summary judgment when it resolved the following disputed facts for itself instead of determining triable issues existed for trial: whether the drivers had ultimate control over their routes; whether the company exercised only limited control over drivers; whether the company's requirements for drivers were dictated by the nature of its business or imposed by the customers rather than the company itself; and whether the company required drivers' vehicles to

10

meet specific specifications).

## II. Local Driver Exemption

Although the FLSA imposes numerous wage and hour requirements to ensure that workers are adequately compensated, the Act provides exemptions from its overtime pay provisions for certain employees. *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104-05 (2d Cir. 2010) (explaining that the general overtime rules of the FLSA do not apply for certain employee types, and, likewise, the NYLL mandates overtime pay and applies the same exemptions as the FLSA.) Because the FLSA is a "remedial law," *Reiseck*, 591 F.3d at 104, exemptions to the overtime pay requirement are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002). Furthermore, the burden of proving that employees fall within such an exemption is on the employer. *Id.*

Defendants argue that, even if Plaintiffs are deemed employees, they were nonetheless exempt "local drivers" as defined by 29 U.S.C. § 213(b)(11). (Defs. Mot. at 26-27.) Section 213(b)(11) provides that the overtime provisions of the Act do not apply to "any employee employed as a driver or driver's helper making local deliveries, who is compensated for such employment on the basis of trip rates, or other delivery payment plan, if the Secretary [of the Department of Labor] shall find that such plan has the general purpose and effect of reducing hours worked by such employees to, or below, the maximum workweek." Significantly, the aforementioned finding by the Secretary is an "explicit prerequisite[] to exemption." 29 C.F.R. § 551.1. The exemption cannot apply unless the employer files a petition with the Department of Labor for an exemption and the petition is granted. *See* 29 C.F.R. § 551.3 ("Any employer

11

desiring to establish an exemption from the overtime pay requirements of the Act . . . under section 13(b)(11) may petition the Administrator, in writing."); 29 C.F.R. § 551.6(b) ("If the Administrator determines that a petition meets all requirements…[then] the Administrator will make an appropriate finding to this effect, and notify the petitioner."). No such petition was filed let alone granted in this case.

Defendants argue that, notwithstanding the aforementioned clear statutory requirements, Plaintiffs' pay structure was "substantially identical" to delivery plans approved by the Department of Labor pursuant to the local driver exemption and it should therefore apply. (Def.'s Mot. at 27.) This argument is directly contrary to the procedural mandates of the Act. There has been no finding by the Secretary as to render the exemption applicable in this matter as required by the Department of Labor. Accordingly, the Local Driver exemption does not apply.

### III. Plaintiff Fernandez's Retaliation Claim

Defendants also seek summary judgement on Plaintiff Fernandez's retaliation claim. (Defs.' Mot. at 30.) The FLSA's anti-retaliation provision makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA] ..." 29 U.S.C. § 215(a)(3). On summary judgment, courts address FLSA retaliation claims under the familiar "burden-shifting" framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). To establish a prima facie case of retaliation under the FLSA, a plaintiff must show "(1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the

adverse employment action." *Mullins v. City of N.Y.*, 554 F.Supp.2d 483, 488 (S.D.N.Y. 2008). The burden of proof at the prima facie stage is *de minimis*. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). If the plaintiff meets this burden, the defendant must offer a legitimate non-retaliatory reason for its actions. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is mere pretext for retaliation. *See Weinstock*, 224 F.3d at 42.

Here, Defendants do not dispute Fernandez has made a prima facie showing of retaliation under the FLSA. Instead, Defendants argue that Fernandez's claim fails because Fernandez is an independent contractor, thus falling outside the protections of the FLSA and NYLL anti-retaliation protections. (Defs.' Mot. at 30.) As discussed above, whether Plaintiffs, including Fernandez, were independent contractors or employees of Defendants is a triable issue for the jury. Defendants also argue that Fernandez's contract was cancelled for a legitimate non-retaliatory reason as part of a broader "wholesale migration of delivery services to a freight broker, and not for any retaliatory purpose." *Id.* It is undisputed that Defendants cancelled a significant number of its IC Agreements in September 2013 and September 2015 pursuant to 30-day notice provisions. (Pls.' Reply 56.1 ¶¶ 17-18.) Plaintiff Fernandez testified that his IC Agreements were cancelled in October 2013, shortly after the filing of the instant action. (Ekelman Aff., Ex. K at 21:15-22.) There is no evidence that any other contracts were cancelled in October. Viewing the evidence in the light most favorable to the nonmoving party, the temporal proximity between the filing of this action and the cancelling of Plaintiff Fernandez's IC Agreements coupled with the lack of evidence that any other contract was cancelled in October is sufficient to create a triable issue as to whether the cancelation was retaliatory. *See*

*Zhengfang Liang v. Cafe Spice SB, Inc.*, 911 F. Supp. 2d 184, 212 (E.D.N.Y. 2012) (denying summary judgment where there was a disputed issue of fact as to whether defendants' proffered reasons for terminating the plaintiff were a pretext for retaliation).

## CONCLUSION[7]

Based on the foregoing, Defendants' motion for summary judgment is DENIED in its entirety.

SO ORDERED:

/s/ LDH
LaSHANN DeARCY HALL
United States District Judge

Dated: Brooklyn, New York
March 28, 2018

---

[7] The Court need not reach Defendants' arguments regarding liquidated damages. *See Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) ("[L]iability has not yet been determined, which is, of course, a prerequisite for [] liquidated damages.").